The PEOPLE of the State of Colorado,
Plaintiff-Appellee,

v.

Douglas Eugene ROARK,
Defendant-Appellant.

No. 80SA389.

Supreme Court of Colorado,
En Banc.

April 5, 1982.

Opinion Modified, and as Modified, Rehearing Denied April 26, 1982.

J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Nathan B. Coates, Asst. Atty. Gen., Denver, for plaintiff-appellee.

Brian T. McCauley, Westminster, for defendant-appellant.

LOHR, Justice.

As the result of a jury trial in Adams County District Court, the defendant, Douglas E. Roark, was convicted of extreme indifference murder,[1] felony murder,[2] second-degree sexual assault,[3] and child abuse.[4] All the charges were based on events which resulted in the violent death of 23-month-old Christie Lee Floyd. The

---

1. Section 18–3–102(1)(d), C.R.S.1973 (1978 Repl.Vol. 8). The definition of extreme indifference murder was amended subsequent to the offense charged here. *See* n.9 *infra.*

2. Section 18–3–102(1)(b), C.R.S.1973 (1978 Repl.Vol. 8).

3. Section 18–3–403, C.R.S.1973 (1978 Repl.Vol. 8).

4. Section 18–6–401, C.R.S.1973 (1978 Repl.Vol. 8). The definition of child abuse has also been amended subsequent to the offense at issue here. *See* n.10, *infra.*

defendant pled not guilty by reason of insanity with respect to each charge. After a trial on the sanity issue, a jury found that he was sane at the time each offense occurred. Thereafter, a different jury found Roark guilty of each of the offenses.

The defendant asserts numerous errors in his sanity trial as well as in the guilt trial. We find no prejudicial error in the sanity trial and so affirm the jury's verdicts that the defendant was sane when each offense was committed. His convictions, however, must be reversed because of errors in the guilt trial. We have held that the extreme indifference murder statute is unconstitutional; thus, the defendant's conviction for that crime cannot stand, and the charge must be dismissed. Additionally, we conclude that the trial court erred in permitting a psychiatrist to testify about certain incriminating statements made by the defendant during a psychiatric examination conducted for use in the sanity determinations. Accordingly, we reverse the judgment of conviction and remand the case for a new trial on the charges of felony murder, second-degree sexual assault, and child abuse.

## I.

On September 30, 1978, the defendant was living with his girlfriend of several months, Deborah Floyd, and Floyd's daughter, Christie, in their apartment in Aurora, Colorado. Travis Roark, the defendant's 5-year-old son from a previous marriage, was visiting with his father at the time. On September 30 Deborah Floyd went out for the evening, leaving the defendant to care for Travis and Christie. The defendant, accompanied by the children, spent the evening with a male friend, drinking beer at the defendant's apartment and playing pool at a nearby establishment.

After the friend left, near midnight, and before Deborah Floyd returned, the defendant experienced difficulty in persuading Christie to go to sleep. Frustrated by his lack of success, he struck the child. The evidence does not establish precisely the ensuing events or their sequence, but within a span of about two hours the defendant had beaten the child severely and placed her on the living room couch. Within the next few hours the young girl died from loss of blood incident to the serious internal injuries that had resulted from the beating.

When Deborah Floyd returned at about 2:30 a. m., both children were on the couch and were covered with sheets, as was their custom when sleeping. The defendant was lying on the floor asleep. He awakened, and, without checking on the children, the two adults went to bed. The next morning the defendant arose early and helped his parents deliver newspapers. When he returned to the apartment shortly after 9:00 a. m., the defendant found that Deborah Floyd had not yet arisen. He then went to the living room, looked at Christie, and determined that she was dead. The defendant cried out, arousing the child's mother. Someone called the police. By the time the police arrived, the defendant's mother and father and the fire department rescue squad were on the scene.

The police entered the apartment, where they found and questioned the defendant. He first attributed Christie's injuries to the acts of neighborhood children. He then was taken to the police station and, after extensive questioning, admitted that he had beaten the child. During the course of the investigation, the apartment was searched and a number of items linked to the child's death were seized.

In this appeal Roark asserts that numerous reversible errors occurred in his sanity trial and in the trial-in-chief. We first address those assignments of error relating to the sanity trial and then discuss the defendant's challenges to the guilt trial proceedings. In the course of considering these matters, we shall set forth additional relevant facts as necessary for an understanding of the issues.

## II.

The defendant relies on the following claimed errors to support reversal of the sanity determination: (A) admission of hearsay evidence about a statement by 5-

year-old Travis Roark, (B) admission of testimony concerning certain of the defendant's statements to the police, (C) receipt of two photographs depicting injuries inflicted by the defendant on his ex-wife, (D) admission of expert testimony concerning a psychological test administered to the defendant, (E) an instruction to the jury, absent a request by the defendant, that the defendant need not testify, and (G) denial of a motion for a new trial based on newly discovered evidence. We address these issues in turn.

## A.

At the sanity trial, Deborah Floyd, the mother of the slain child, testified about an incident which occurred outside her residence while the police were first investigating the death. Deborah Floyd and Travis Roark had moved outside to wait in a pick-up truck. A stranger passed by and asked Floyd about the cause of the commotion. She responded, "Some kids, from what I had heard, had murdered my daughter." Travis then said, "Debbie, the kids didn't beat Christie up, my daddy did but he told me not to tell you." Deborah Floyd testified that she then told a police officer of Travis' statement. This testimony was received over a timely objection by the defendant that it was hearsay and that 5-year-old Travis had not been shown to be competent. The trial court held the statement admissible as part of the *res gestae*.

"The *res gestae* or excited utterance exception [to the hearsay rule] applies to statements relating to a startling act or events made spontaneously and without reflection while the declarant was under the stress of excitement, and offered to prove the truth of the matter asserted." *Lancaster v. People*, Colo., 615 P.2d 720, 721 (1980). In *Lancaster*, we considered that hearsay exception as applied to the victim of a sexual assault who was 2 years and 10 months old at the time. Addressing the question whether testimonial incapacity due to age is a bar to admission of a hearsay statement which would otherwise be admissible in evidence as *res gestae*, we concluded

that it is not. We reasoned that "[t]he requirement of spontaneity and excitement subsumed by the *res gestae* exception furnishes a sufficient guarantee of trustworthiness implicit in the rationale of hearsay exceptions." *Id.* Colo., 615 P.2d at 722 (citations omitted). That ruling is dispositive of the defendant's competency objection to Travis' statement, for that statement is admissible, if at all, only if it fits within the *res gestae* exception to the rule prohibiting admission of hearsay evidence.

In *Lancaster* we also considered whether the half-hour lapse of time between the sexual assault and the time the victim arrived home and made the challenged statement to her mother disqualified the statement as *res gestae*. We held that contemporaneity is not strictly required and ruled that "[w]hat is of critical significance to *res gestae* is the spontaneous character of the statement and its natural effusion from a state of excitement." We further noted that "[c]onsiderable latitude in temporal proximity is particularly evident in cases involving assertions by very young children after a stressful experience . . . [because] children of tender years are generally not adept at reasoned reflection and at concoction of false stories under such circumstances." *Lancaster v. People, supra*, Colo., 615 P.2d at 723 (citations omitted).

In the instant case, Travis Roark experienced two highly stressful series of events. Less than twelve hours before his statement, he was present while his father severely beat Christie Floyd over a period of about two hours. Shortly before his statement, he observed the emotional reaction of his father and Deborah Floyd to the discovery of Christie's death, and witnessed the ensuing arrival of the ambulance crew and the police. From the time the beating began until Travis left the apartment with Deborah Floyd, he was either in his father's presence or asleep. Finally, the statement was not triggered by questioning but by Deborah Floyd's statement that some boys had killed Christie, a story which Travis knew to be untrue. These circumstances are persuasively indicative that the chal-

lenged statement was spontaneous and produced by the state of excitement generated by the preceding events. We conclude that the trial court correctly received Travis' statement into evidence.

### B.

■ The defendant asserts that the trial court erred in admitting into evidence at his sanity trial certain statements that he made to the police during his interrogation at the police station. Before the questioning began, the defendant was advised of his *Miranda*[5] rights and elected to waive them. Initially, he answered the officers' questions, maintaining his innocence of any wrongdoing and blaming neighborhood children for Christie's injuries. Eventually he acknowledged having slapped her. Then, in response to an officer's urging that he tell about spanking the child, he said, "Why should I tell you about it when I can tell a jury about it." The defendant contends that this statement sufficiently evinced a wish to cut off questioning so that any information developed by interrogating him further violated his right under *Miranda v. Arizona, supra.* Although the defendant did not object contemporaneously to admission of these statements at the sanity trial, he claims that the trial court's admission of this evidence was plain error. *See* Crim.P. 52(b). We find no such error in the admission of the challenged statements at the sanity trial because the statements were merely cumulative of other properly admitted evidence.

Among the defendant's witnesses at the sanity trial were two psychiatrists, Dr. Glisman and Dr. Steele, who testified about statements made by the defendant in the course of psychiatric examinations. Dr. Glisman described in some detail the defendant's statements that he severely beat Christie Floyd over a period of time in a mood of murderous anger, placed her on the couch, and returned from delivering papers the next morning to find the child dead. Dr. Steele testified about the defendant's description of the same events, adding even more detail. The prosecution also presented the testimony of a psychiatrist who had interviewed the defendant. He too related the defendant's statements describing the beating and resulting death of Christie Floyd.[6]

The statements made by the defendant to police officers after his comment about telling his story to a jury instead of the police were merely cumulative of this voluminous evidence, properly received, describing in detail the defendant's admission of the acts which caused the death of Christie Floyd. They were presented to a jury that had the limited function of determining whether the defendant was legally sane. We conclude that, whether the defendant's statements to the police were or were not taken in violation of his Fifth Amendment right to remain silent, their introduction in evidence at the sanity trial was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17

5. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

6. The defendant does not challenge the admission of this testimony and it is clear that he could not successfully do so. The ultimate issue at a sanity trial is not whether the defendant committed the acts with which he is charged, but rather, whether he was legally sane under the standards prescribed in section 16–8–101, C.R.S.1973 (1978 Repl.Vol. 8) at the time the events occurred. For this reason, we have held that statements by a defendant to an examining psychiatrist during a court-ordered examination under section 16–8–105, C.R.S. 1973 (1978 Repl.Vol. 8) can be presented at a sanity trial, to the extent they enter into the formation of the expert's opinion as to the

defendant's mental condition, even though such statements constitute admissions that the defendant committed the charged criminal acts. *Lewis v. Thulemeyer,* 189 Colo. 139, 538 P.2d 441 (1975); *see* section 16–8–106(3), C.R.S. 1973 (1978 Repl.Vol. 8). The statutory proscription of the use of such statements as part of the prosecution's case-in-chief at the trial on the issue of guilt, section 16–8–107(1), C.R.S. 1973 (1978 Repl.Vol. 8), together with the requirement that a different jury consider the issue of guilt, section 16–8–104, C.R.S.1973 (1978 Repl.Vol. 8), are sufficient to assure that use of a defendant's incriminating statements at his sanity trial does not violate his privilege against self-incrimination. *Lewis v. Thulemeyer, supra.*

L.Ed.2d 705 (1967); *Early v. People*, 178 Colo. 167, 496 P.2d 1021 (1972).[7]

### C.

■ Over the defendant's objection, two photographs were received in evidence at the sanity trial depicting injuries inflicted by the defendant on his ex-wife during an incident which occurred about six months before the death of Christie Floyd. The defendant claims that prejudicial error resulted from the trial court's ruling. We disagree.

The incident in which the defendant injured his ex-wife was first brought before the jury through testimony of a psychiatrist called by the defense. In rebuttal the ex-wife testified, without objection, about the same events. The first objection raised by the defendant was when the photographs were offered in evidence to show the injuries earlier described by the witnesses. After holding an *in camera* hearing on the objection, the trial court received the photographs in evidence, but gave the jury an oral cautionary instruction that the defendant was not on trial for assault on his ex-wife and that the evidence was received only for its bearing on the sanity issue.

■ Ordinarily, photographs are admissible to depict graphically anything a witness may describe in words, provided that the prejudicial effect of the photographs does not far outweigh their probative value. *E.g., People v. Thorpe*, Colo., 641 P.2d 935 (1982); *People v. White*, 199 Colo. 82, 606 P.2d 847 (1980); *People v. Sepeda*, 196 Colo. 13, 581 P.2d 723 (1978); *People v. Jones*, 184 Colo. 96, 518 P.2d 819 (1974). The determination of admissibility is committed to the sound discretion of the trial judge. *Id.*

The challenged pictures show the ex-wife's injuries in a direct, non-inflammatory manner. Under the circumstances here, the trial judge did not abuse his discretion by receiving the photographs in evidence.

### D.

■ At the sanity trial psychiatrist Irwin Levy, a witness for the prosecution, was permitted to testify to the results of a psychological test, the Minnesota Multiple Personality Inventory (MMPI), over the defendant's objection that such evidence cannot be received unless the test questions are made available at trial. We conclude that the trial court did not commit reversible error in overruling the objection.

The statute upon which the defendant relies is section 16–8–107(2), C.R.S.1973 (1978 Repl.Vol. 8), which provides:

In any trial or hearing concerning the defendant's mental condition, physicians and other experts may testify as to the conclusions reached from their examination of ... psychological test results if the material which they examined in reaching their conclusions is produced at the time of the trial or hearing.

Dr. Levy testified that the test contains a large number of questions, and requires one hour to one and one half hours to complete. The answers available are "true," "false," "mostly true," and "mostly false." The examiner plays no part in administering the test, and simply totals the number of answers in each category at the test's conclusion. Based upon certain indicators built into the questions, the examiner is able to determine the validity and reliability of the test results from the distribution of the answers and from criteria furnished by the designers of the test. No evaluation of the questions themselves is performed by the examiner. By reference to these reliability criteria, Dr. Levy determined and testified that the defendant was "faking bad," *i.e.*, answering the questions in such a manner as to appear very psychotic. This indicates an unreliable test, so Dr. Levy made no further use of the test results in forming his opinion of the defendant's sanity. In the prosecution's rebuttal case, psychologist

---

7. We need not and do not decide the correctness of the view previously expressed by the Colorado Court of Appeals that, because guilt is not at issue in a sanity trial, the privilege against self-incrimination is not applicable in such a proceeding. *See People v. Osborn*, 42 Colo.App. 376, 599 P.2d 937 (1979).

Dr. Moncrieff testified about the test without objection. Dr. Moncrieff had administered the MMPI to the defendant on a separate occasion, and the results obtained were very similar to those achieved in the test administered by Dr. Levy. As in the case of Levy's testimony, Moncrieff described the test, the results, and the conclusion that the test score was unreliable.

As the doctors testified, the results of the MMPI tests indicated that the answers were unreliable and could not be used as a basis for assessing the defendant's mental condition. The cross-examination of the doctors made it clear that the fact the defendant was "faking bad" on the MMPI was not necessarily inconsistent with a determination that he was legally insane; it meant only that the MMPI could not be used as a basis for reaching that determination.

Levy's testimony reveals that his determination that the defendant was legally sane was based upon an extensive interview conducted over two days. Because the MMPI was found to be unreliable, it was simply irrelevant to that determination and the jury's assessment of Levy's diagnosis. Further, because of the nature of the examination, Levy did not participate in administration of the test, except to hand the defendant the booklet, and did not evaluate answers to specific questions, but only totalled the answers in different categories. Finally, as to the test results and their meaning, Dr. Levy's testimony substantially duplicated the testimony of Dr. Moncrieff, to which no objection was made. Therefore, although the questions should have been required to be produced, failure to do so in this case caused no prejudice.

### E.

■ The defendant also argues that the trial court erred when, without his request, it instructed the jury at the sanity trial that a defendant need not testify. The challenged instruction reads:

> You are instructed that a person charged with a crime in this state may testify in his own behalf, but he may not be compelled to do so. Thus, whether or not he does testify rests entirely in his own decision. The fact that the defendant did not testify in this case cannot be taken or considered any evidence of his sanity or insanity.

The United States Supreme Court has held that a defendant's right to due process of law is not violated by giving such an instruction in a guilt trial, even over the defendant's objection. *Lakeside v. Oregon*, 435 U.S. 333, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978). While disapproving use of such an instruction in a guilt trial over the defendant's objection, we have consistently held that even in those circumstances the giving of the instruction is not prejudicial error. *White v. People*, 175 Colo. 119, 486 P.2d 4 (1971); *McLean v. People*, 172 Colo. 338, 473 P.2d 715 (1970); *Kimmel v. People*, 172 Colo. 333, 473 P.2d 167 (1970).

■ The record does not include the proceedings in which the jury instructions were settled, and so does not reflect whether the defendant registered a contemporaneous objection to the court's decision to give the challenged instruction. If a defendant challenges a ruling by a trial court, it is his obligation to designate that portion of the record reflecting the court's ruling and his objection. *See Till v. People*, 196 Colo. 126, 581 P.2d 299 (1978); *People v. Cram*, 180 Colo. 418, 505 P.2d 1299 (1973).

The defendant has not shown that he made a contemporaneous objection and has advanced no rationale to support the conclusion that, even if he had, the rule to which we have adhered in prior cases involving instructions in guilt trials should not be followed in sanity trials. Accordingly, the defendant has not established a right to reversal of the jury verdict in the sanity trial by reason of the challenged instruction.

### F.

■ At the conclusion of the sanity trial, both the prosecution and the defendant submitted instructions on the consequences that would follow from a verdict of not

guilty by reason of insanity. The trial court gave the People's tendered instruction, as follows:

> You are informed of the following as an informational instruction:

> If the defendant is found not guilty by reason of insanity, it is the duty of the Court to commit the defendant to the Department of Institutions until such time as the defendant is determined to no longer require hospitalization because he no longer suffers from a mental disease or defect which is likely to cause him to be dangerous to himself, to others, or to the community in the reasonably foreseeable future.

> If the defendant is found not guilty by reason of insanity, he will never be tried on the merits of the criminal charges filed against him.

> If the defendant is found sane, he is entitled to be tried at a later time on the merits of any such charge to which he is found sane.

> This instruction is informational, only, and should have no bearing on your determination of the proper verdicts under the evidence in this case. (Emphasis added.)

The instruction tendered by the defendant consisted of a single paragraph identical to the paragraph immediately following the colon in the instruction given.

There is nothing in the record before us to indicate that the defendant objected to the instruction as given, and he did not raise this objection in his motion for new trial. Now he asserts that the emphasized portion of the instruction improperly emphasizes that a verdict of not guilty by reason of insanity renders the defendant immune from future trial on the merits of the criminal charges. The likely result of this emphasis, he argues, will be a result-oriented verdict that the defendant is sane, because of the jury's predictable reluctance to see him forever immunized from facing trial on the substantive offenses.

As the parties recognize, we considered this question in *People v. Thomson*, 197 Colo. 232, 591 P.2d 1031 (1979). In that case we upheld an instruction, given at the defendant's request, in the exact language of the instruction here tendered by the defendant. Our holding was based upon our recognition that an average juror is not aware of the consequences of a verdict in a sanity trial, and is often concerned that a defendant will be returned to the community at large if found not guilty by reason of insanity. As a result, the juror is distracted from his proper fact-finding function.

We recognized that an instruction such as that tendered by the defendant in *Thomson* might create evils of its own by influencing the jury to reach a not-guilty by-reason-of-insanity verdict upon a result-oriented basis. Although not explicitly explained in that case, the apparent concern was that if jurors knew that a defendant found not guilty by reason of insanity would be committed to the Department of Institutions until cured, the jurors would be inclined to make a finding of insanity to ensure that a defendant whom they perceived to be dangerous would be removed from society immediately. However, after apparently weighing these considerations in the balance, we concluded that the greater danger was a miscarriage of justice resulting from a jury influenced by apprehension of the unknown consequences of its verdict. Therefore, we held that the court should give "a jury instruction which clearly and simply explains the consequences to the defendant of an insanity verdict. Such an instruction should clearly indicate that it is only informational and is to have no persuasive bearing on the jury's determination of a proper verdict under the evidence." 197 Colo. at 233–34, 591 P.2d at 1032. We went on to prescribe language to advise the jury that the instruction is informational only.

The instruction given in this case complies with the letter and spirit of our decision in *People v. Thomson, supra.* It advises the jury in plain terms, without embellishment, of the effect of the verdicts available to them, and clearly tells them that it

is informational only.[8] The underlined paragraphs merely serve to answer the question that would naturally arise from reading the preceding paragraph, *i.e.*, whether the defendant could be tried on the issue of guilt after release from the state hospital following a verdict of not guilty by reason of insanity. Accordingly, we conclude that the defendant's objection to the instruction on the effect of the jury verdict at the sanity trial is not well taken.

## G.

■ The defendant argues that the trial court erred in denying his motion for a new sanity trial based on newly discovered evidence.

In his motion, the defendant asserted that his post-trial eye examination disclosed retinal damage. In argument on that motion, defense counsel tendered the optometrist's records reflecting such a finding, and requested an additional hearing to present expert testimony that "corneal retinal damage does brain damage," or to obtain and present the results of a CAT scan test reflecting that asserted fact.

The trial court, noting the extensiveness of the evidence at the sanity hearing and the number of expert witnesses who testified about the defendant's mental condition, denied the motion for an additional hearing and the motion for a new sanity trial.

We have held repeatedly that motions for a new trial based on newly discovered evidence are viewed with disfavor and that denial of such motions will not be overturned unless a gross abuse of the trial court's discretion is established. *E.g., People v. Gutierrez*, Colo., 622 P.2d 547 (1981); *People v. Scheidt*, 187 Colo. 20, 528 P.2d 232 (1974); *Digiallonardo v. People*, 175 Colo. 560, 488 P.2d 1109 (1971). In the context of a guilt trial we have stressed that the newly discovered evidence must be of such a character as probably to bring about an acquittal verdict if presented at another trial. *Id.*

The defendant's offer of proof in the present case fell far short of reflecting that the new evidence would probably result in a finding of not guilty by reason of insanity. The defendant did not assert that any specific expert would be able to testify that a relationship existed between the physical condition discovered by the optometrist and the statutory standard by which a defendant's sanity must be tested. The trial court did not abuse its discretion by declining to hold an additional hearing and denying the motion for a new sanity trial.

## III.

The defendant also claims that prejudicial errors were committed in his guilt trial. Specifically, he contends that (A) his conviction for extreme indifference murder is invalid because the statute defining the offense is unconstitutional, (B) all charges should be dismissed because the police negligently failed to preserve a sample of the defendant's blood in a condition suitable for blood-alcohol testing, (C) all charges should be dismissed because the police investigation was inept and failed to collect or preserve other evidence relevant to his defense, and (D) he was subjected to double jeopardy because all four convictions were based on a single course of conduct.

Additionally, the defendant claims the court erred in receiving certain evidence at trial. The evidence to which he objects and the bases of his objections can be summarized as follows: (E) the testimony of defense psychiatrist Dr. Steele about incriminating statements made by the defendant during a sanity examination—because it violates the physician-patient privilege; (F) all items found in the defendant's apartment—because they were discovered during a warrantless search which violated his Fourth Amendment rights; and (G) all statements made by the defendant in response to police interrogation after he expressed a desire that the questioning stop—because they were obtained in violation of his Fifth Amendment privilege against self-incrimination.

8. Although it does not follow the exact words prescribed in *People v. Thomson, supra*, for that purpose, the substance is the same, and the instruction is adequate.

Finally, the defendant asserts error in two jury instructions: (H) an instruction limiting the effect to be given to evidence of the defendant's intoxication, and (I) an instruction limiting the effect to be given to evidence of the defendant's impaired mental condition.

We have held that the extreme indifference murder statute is unconstitutional, so the defendant's conviction on that charge must be reversed. We have also held that statements made by a defendant to a psychiatrist in the course of a sanity examination cannot be received at the guilt trial. This latter error requires reversal of all the defendant's other convictions.

In view of the likelihood that the other issues outlined above will arise again on retrial, we elect to address them.

### A.

■ Included among the defendant's grounds for challenging his conviction for extreme indifference murder is the contention that the statute defining the crime is unconstitutional. We agree. Subsequent to the trial of this case we decided *People v. Marcy*, Colo., 628 P.2d 69 (1981) in which we held "that the statutory prohibition of extreme indifference murder in section 18–3–102(1)(d) [C.R.S.1973 (1978 Repl.Vol. 8) ] violates equal protection of the laws, *Colo. Const.*Art. II, Sec. 25, because it cannot reasonably be distinguished from the lesser offense of second degree murder as defined in section 18–3–103(1)(a) [C.R.S.1973 (1978 Repl.Vol. 8) ]." Colo., 628 P.2d at 80. *Accord, People v. Lee*, Colo., 630 P.2d 583 (1981); *People v. Gurule*, Colo., 628 P.2d 99 (1981); *People v. Curtis*, Colo., 627 P.2d 734 (1981). Our decision in *Marcy* and the cases which have followed it require that the defendant's conviction for extreme indifference murder be reversed.[9]

### B.

■ The defendant argues that all charges against him should be dismissed because police negligence in failing to preserve a sample of his blood in a condition suitable for testing deprived him of due process of law.

After the defendant was questioned at the police station, he was taken to a hospital, where samples of his blood were drawn on October 2, 1978. No preservatives were placed in the blood. Although the blood samples were refrigerated, the police inadvertently failed to send them to the Colorado Bureau of Investigation laboratory to be tested until November 17, 1978, by which time the blood had putrified and could not be tested for alcohol content. The defendant contends that this denied him evidence that might have been exculpatory and that was relevant to testing the correctness of two conflicting stories he had told about the quantity of alcohol he had consumed. Thus, he argues that the requirements of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *People v. Gomez*, 198 Colo. 105, 596 P.2d 1192 (1979) have been violated.

The defendant's argument has two basic thrusts. First, he claims that intoxication is relevant to negate the culpable mental state required for the crimes charged. Second, he urges that the evidence would have corroborated his story—told after he admitted beating the child—that he had consumed a large amount of alcoholic beverages prior to the events resulting in the child's death, and would have shown that his earlier story, which minimized his alcohol consumption, was in error.

The defendant misapprehends the cases upon which he relies. In *Brady v. Maryland, supra*, the defendant requested permission to examine extrajudicial statements made by his complicitor. The prosecution withheld one statement in which the defendant's complicitor admitted that he was the one who accomplished the killing with which he and the defendant were charged. This evidence was material to punishment but not to guilt. The court stated:

> Since this amendment was subsequent to the offense charged, it has no bearing on our resolution of the present case.

---

**9.** The definition of extreme indifference murder was amended, effective July 1, 1981. Colo. Sess.Laws 1981, ch. 212, 18–3–102 at 973.

We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

373 U.S. at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218. In *People v. Gomez, supra*, the issue was the propriety of a trial court's suppression of testimony relating to certain exhibits because those exhibits had been destroyed by prosecution experts in the process of testing, leaving the defendant with no ability to test them independently. *See also Garcia v. District Court*, 197 Colo. 38, 589 P.2d 924 (1979).

Here, there is neither denial of access to relevant evidence nor utilization of evidence unavailable to the defendant for independent testing. The People made no use of the blood sample in question. Compare this case with *People v. Morgan*, 199 Colo. 237, 606 P.2d 1296 (1980), where the People were prohibited from introducing evidence with respect to a severed fingertip that had been lost after testing by the People but before being made available to the defendant for testing.

The defendant would have us hold that the investigators of a crime have a duty to gather possible exculpatory evidence, or at least that, having gathered it, they have a duty to preserve it for possible use by the defendant. We decline to impose such a duty, at least where, as here, there is no indication that the police acted in bad faith in allowing the evidence to become unusable without accomplishing tests for possibly relevant information.

In *People v. Culp*, 189 Colo. 76, 537 P.2d 746 (1975), we held that due process of law does not require that a chemical test for blood-alcohol content be offered to a person arrested for driving under the influence of intoxicating liquor. There we quoted with approval from *State v. Reyna*, 92 Idaho 669, 448 P.2d 762 (1968):

... the right to due process of law does not include the right to be given a blood test in all circumstances. To hold otherwise would be to transform the accused's right to due process into a power to compel the State to gather in the accused's behalf what might be exculpatory evidence. In this case, the State produced testimonial evidence of intoxication, but it had no obligation to obtain for appellant what he speculates might have been more scientific evidence of sobriety. The State may not suppress evidence, but it need not gather evidence for the accused.

92 Idaho at 674, 448 P.2d at 767. *Accord People v. Sasson*, Colo.App., 628 P.2d 120 (1980).

 It is also significant that the evidence of intoxication is not central to the offenses charged. All three crimes charged are general intent crimes, except that one alternative method of committing child abuse is by intentional abuse.[10] Impaired mental state resulting from voluntary intoxication is not a defense to a general intent crime. *People v. DelGuidice*, 199 Colo. 41, 606 P.2d 840 (1979).

 The blood was drawn more than twelve hours after the homicide. The defendant made no attempt to show the relevance or materiality of any blood-alcohol test results based on these blood samples to the determination of his guilt or innocence. Under the circumstances here, failure to preserve the blood samples for testing by the defendant did not violate his right to due process of law.

## C.

The defendant moved to dismiss the charges on the basis that the allegedly inept police investigation resulted in failure to collect or preserve relevant evidence and thus denied him due process of law. In support of this motion, the defendant urged primarily the failure to preserve the blood samples, discussed in the immediately preceding section of this opinion. The other

---

**10.** In 1980, the legislature altered the *mens rea* applicable to the crime of child abuse. It was changed from "knowingly, intentionally, or negligently" to "knowingly, recklessly, or through criminal negligence." Colo.Sess.Laws 1980, 18–6–401 at 544.

respects in which the investigation is argued to have fallen short include failure to collect one of fourteen beer bottles which were shown to have been present at the crime scene, failure to test liquid found in a glass on a night stand, and neglect to record where each seized item was found. The defendant also complains that, although teeth impressions of the defendant were inconclusive, a pathologist was permitted to testify at the guilt trial that certain marks on the victim's body were consistent with bite wounds. Additionally, he points out that evidence of stain swabs from the bathroom wall was received even though the quantity of material was insufficient to permit analysis, and evidence of seminal fluid on adult undershorts found at the crime scene was admitted even though the age of the semen could not be determined. The defendant contends that the foregoing deficiencies, combined with the warrantless search and the failure to terminate questioning when the defendant exhibited reluctance to answer, denied him due process of law. He again relies on *Brady v. Maryland, supra,* in support of that proposition. We do not agree.

As in the case of the spoiled blood samples, the defendant was not denied access to relevant information, and the prosecution did not utilize evidence unavailable to the defendant for independent testing. He points to no specific prejudice which resulted from the asserted deficiencies in the investigation. To the extent any investigatory deficiencies related to evidence presented at trial, the defendant had full opportunity by cross-examination to bring out any lack of probative value. Again, we decline to impose an affirmative duty on the prosecution and the police to gather evidence or to have it tested on the speculative basis that it might have some unspecified use for exculpatory purposes. *See People v. Sasson, supra; State v. Reyna, supra.* Compare the present case with *People v. Gomez, supra*; and *Garcia v. District Court, supra.*

### D.

The defendant asserts that all the charges against him were supported by evidence of the same acts. The effect, he argues, is that the charges merge and that separate convictions, based on his single course of conduct, violate constitutional protections against double jeopardy. *See U.S.Const.* amend. V; *Colo.Const.*Art. II, § 18. These arguments are devoid of merit.

The very case upon which the defendant relies, *People v. Bugarin,* 181 Colo. 62, 507 P.2d 875 (1973), conclusively refutes his argument. There, we considered a similar double jeopardy claim and held:

> Colorado . . . has long followed the interpretation of the federal double jeopardy provision set forth in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), and *Gore v. United States,* 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958), to determine whether two offenses are the same. Briefly stated, the rule is that a single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other.

181 Colo. at 65, 507 P.2d at 877; *accord, e.g., People v. Rael,* 199 Colo. 201, 612 P.2d 1095 (1980); *People v. Salas,* 189 Colo. 111, 538 P.2d 437 (1975); *see also* section 18–1–408(1), C.R.S.1973 (1978 Repl.Vol. 8).

It hardly requires demonstration that, among other distinctions, felony murder requires death whereas the other two charges do not; second-degree sexual assault requires sexual penetration or sexual intrusion whereas the other two charges do not; and child abuse requires that the victim be a child whereas the other two charges do not. Thus, we reject the defendant's merger-double jeopardy claim.

### E.

In the first of his evidentiary objections relating to the guilt trial, the defendant contends that reversible error occurred

when the prosecution was permitted to present evidence of statements made by the defendant to Dr. Brandt Steele. Dr. Steele is a psychiatrist who examined the defendant at the latter's request in preparation for the sanity trial, in accordance with section 16–8–108, C.R.S.1973 (1978 Repl.Vol. 8). After the sanity trial the prosecution moved to endorse Dr. Steele as its witness at the trial on the issue of guilt. The defendant objected, contending that to permit such testimony would violate the physician-patient privilege. The trial court granted the motion to endorse and overruled the defendant's renewed objection when Dr. Steele was called by the prosecution as a witness at the guilt trial. The trial court ruled that the privilege had been waived when the defendant called Dr. Steele as a witness at the sanity trial.

Dr. Steele testified about the defendant's admission during the course of his psychiatric examination that, during the course of the beating, he had inserted his finger in the victim's vagina with "some force" with the purpose of hurting her. This testimony was directly relevant to the second-degree sexual assault charge, which in turn was the predicate for the defendant's conviction of felony murder. It is also highly relevant to the child abuse count.

Subsequent to the defendant's convictions, we decided *People v. Rosenthal*, Colo., 617 P.2d 551 (1980), in which we held "that the prosecution may not call as a witness in its case-in-chief during the guilt trial a psychiatrist privately retained by the defendant in connection with an insanity plea and elicit from the psychiatrist incriminating admissions made by the defendant during a sanity examination." Colo., 617 P.2d at 555. This holding has its roots in the constitutional privilege against self-incrimination, *U.S.Const.* amends. V and XIV; *Colo.Const.* Art. II, § 18, for "[i]f the prosecutor is permitted to make unrestricted use at the guilt trial of the defendant's psychiatric communications during a sanity examination by a privately retained psychiatrist, the defendant in effect becomes a witness against herself through the conduit of a psychiatric examiner." *People v. Rosen-*

*thal, supra*, Colo., 617 P.2d at 555. As we recognized in *Rosenthal*, this reasoning applies with equal force to communications made by indigent defendants to court-appointed psychiatrists pursuant to section 16–8–108(1), C.R.S.1973 (1978 Repl.Vol. 8).

Dr. Steele's testimony was highly prejudicial to the defendant at the trial on the issue of guilt. As *Rosenthal* establishes, admission of this evidence over the defendant's objection violated his privilege against self-incrimination. This error requires that the defendant's convictions be overturned and that the case be remanded for a new guilt trial on the charges of felony murder, second-degree sexual assault, and child abuse.

### F.

Before trial the defendant moved to suppress all items of "physical or testimonial" evidence seized from the defendant's residence by law enforcement authorities. After a hearing on this and other motions, the trial court denied the requested relief in its entirety, relying on implied waiver or consent and a doctrine of emergency as justifications for the searches.

We affirm the trial court's ruling that the initial entry by the police was appropriate, but neither the court's findings nor the evidence on which they are based are sufficiently detailed to resolve whether each item of evidence seized at the residence is admissible under governing standards. We now discuss those standards to provide guidance to the trial court on remand.

We first note that the United States Supreme Court has recently held that there is no special exception to Fourth Amendment requirements which permits the police to conduct a warrantless search at the scene of a possible homicide. *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). We had previously reached the same conclusion and held that there is no general exception to the warrant requirement permitting exploratory searches at a death scene. *People v. Williams*, 192 Colo. 249, 557 P.2d 399 (1976);

*accord, People v. Draper,* 196 Colo. 450, 586 P.2d 231 (1978). Therefore, it is necessary to apply traditional precepts of Fourth Amendment law in determining the validity of searches and seizures at the location of a violent death.

It is well-settled that, subject to a few narrow exceptions, searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Those seeking to rely on an exception to the warrant requirement have the burden of demonstrating its applicability. *E.g., People v. Williams,* Colo., 613 P.2d 879 (1980); *People v. Alexander,* 193 Colo. 27, 561 P.2d 1263 (1977). The exceptions to the warrant requirement that are arguably applicable to the present case are consent, plain view, and the exigent circumstances doctrine.

In the instant case, there were two analytically distinct searches conducted by the police. The first was the initial entry in response to the emergency call reporting the death of Christie Floyd. The second occurred when, after removing the occupants from the house and securing the premises, the police conducted a more extensive search and seized several items of incriminating evidence. The basis and scope of permissible police activity at the time of initial entry and after the premises were secured will be analyzed in turn.

The trial court found that the initial entry was gained by consent. The evidence supports this finding. While the record does not specify who placed the call to the police after the young girl's death was made known, the defendant took the position initially that others were responsible for Christie Floyd's injuries. It is reasonably inferable from this that the call which summoned the police and the fire department emergency unit was placed with the express or implied agreement of both the defendant and Deborah Floyd. *Cf. People v. Amato,* 193 Colo. 57, 562 P.2d 442 (1977) (warrantless entry by police and fire department personnel in response to landla-

dy's call requesting assistance for tenant suffering from "possible overdose" of drugs justified by exigent circumstances).

Once inside the residence, the police were in a position to observe the body and to conclude that death occurred by violent means. Anything they saw in plain view that might provide evidence of how the child's death occurred was subject to seizure, and testimony concerning that evidence should not be suppressed. We have recently explained the plain view doctrine in *People v. Franklin,* Colo., 640 P.2d 226 (1982) and *People v. Stoppel,* Colo., 637 P.2d 384 (1981). These cases provide guidance for the trial court on remand.

To the extent that the police search activities at the time of entry went beyond the scope of the consent of the apartment's occupants and beyond discovery of items located in plain view, they may be supportable by the doctrine of exigent circumstances. In an appropriate case, a prompt and limited warrantless search of a homicide scene may be necessary to determine if there are other victims or if the perpetrator of the crime is still on the premises but undetected. *Mincey v. Arizona, supra; People v. Harding,* Colo., 620 P.2d 245 (1980). Additionally a limited search and seizure may be justified if it is necessary to avoid the immediate destruction of evidence. *See McCall v. People,* Colo., 623 P.2d 397 (1981); *People v. Draper, supra.* It must be remembered, however, that a warrantless search is strictly circumscribed by the exigency which creates its justification. *Mincey v. Arizona.* In no case may a specific emergency be used to justify a general exploratory search. The guiding principles are that a search based on exigent circumstances requires the presence of an immediate crisis, and the police response must be strictly limited to that action necessary to respond to the exigency. *People v. Gomez,* Colo., 632 P.2d 586 (1981); *McCall v. People, supra.*

After the defendant was taken to the police station and the family members were excluded from the apartment any exigent

circumstances disappeared. *People v. Draper, supra; People v. Williams*, 192 Colo. 249, 557 P.2d 399 (1976). Having secured the premises, there was no further danger to the police or to others and there was no risk that relevant evidence might be destroyed. Nor can the People rely on the plain view exception to support their later search, since that exception requires a previous justification for the presence of the officers. *People v. Franklin, supra.* Absent a warrant, the subsequent search was permissible only if the police obtained consent to this conduct.

The trial court found that the initial consent carried forward to the search conducted after the apartment was secured, but this finding is colored by and mixed with a ruling that the search was also justified as an emergency. To the extent this reflects adoption of a death scene exception to Fourth Amendment search standards, it is not well founded. *Mincey v. Arizona, supra; People v. Williams*, 192 Colo. 249, 557 P.2d 399 (1976).

We do not hold that in the situation here consent to further search could not be found unless express. We do hold that the record does not support the trial court's finding that the continuation or resumption of the search after the family members were excluded can be supported by consent. Before a new trial is held the parties should be given an opportunity to present additional evidence on the motion to suppress items found in the defendant's apartment, and the trial court, guided by the standards discussed in this opinion, should make specific factual findings necessary to resolve that motion in accordance with those standards. Particular attention should be given to the activities of the officers, the items found in plain view, and any conversation between the officers and Deborah Floyd or the defendant bearing on the officers' activities and not developed by evidence at the previous suppression hearing.

## G.

The defendant claims that the requirements of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) were violated when the police officers continued to question him after he responded to an officer's urging that he tell about spanking Christie Floyd by saying "Why should I tell you about it when I can tell a jury about it." I agree. The majority of the court, however, does not. Justice Rovira's separate opinion reflects the opinion of the court on this issue. The remainder of this subsection G reflects my minority opinion, in which I am joined by Justices Dubofsky and Quinn.

The defendant does not assert that he was not fully advised of his rights, as required by *Miranda*, before questioning began at the police station. Nor could he reasonably do so. The record reflects that he was advised orally and in writing and that he signed a written waiver of his right to remain silent, all before that questioning began. The trial court found that the defendant's decision to waive that right was knowing, intelligent, and valid. The question is whether, after the interrogation began, the defendant's right to cut off questioning was invoked and, if so, whether that right was scrupulously honored. *See Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); *Miranda v. Arizona, supra.*

No verbatim record of the questioning was made. The statement at issue was made by the defendant while being questioned by Detective Utesch in the presence of Detective Stahl. During the cross-examination by defense counsel at the suppression hearing, Stahl described the context in which the statement was made as follows:

Q: And you testified that the Defendant was being interviewed by you and you advised him of his rights and he told you about the neighborhood beating and then Officer Utesch asked him something to the effect of, "Why don't you tell us about the beating?"

A: "Tell us about the spanking."

Q: Yeah, the spanking, and he said, "Why should I when I can tell the jury?" Did you stop at that point?

A: He didn't refuse to answer. He said, "Why should I tell you about it if I can tell the jury?"

Q: Didn't that indicate to you that he didn't want to talk?

A: That didn't indicate to me that he was saying "Not at all."

Q: You didn't even ask him if he wanted to stop at that point?

A: I wouldn't take that as him wanting to conclude the interview.

Q: You didn't interpret that as saying he didn't want to answer that question?

A: Absolutely no.

Q: And you didn't inquire whether that is what he meant, did you? You just pursued it.

A: I didn't even think of it until now that it even did imply that.

Q: He did that on one other occasion.

A: He may have reiterated that, about telling that he could tell the jury about it.

Q: You didn't see that as being resent (sic) to your questioning?

A: No I did not.

Q: You didn't stop.

A: He was at that time denying it and denying it and was making excuses for it about the neighborhood children and I did not ever interpret that as him wanting to cease the interview, not at all.

The trial court ruled at the conclusion of the suppression hearing that this exchange did not indicate "that Mr. Roark was terminating the questioning and had refused to talk at that time."

The defendant also relies on evidence at the sanity trial for development of the context in which his references to telling his story to a jury were made. Detective Stahl's testimony at that trial was that, after the defendant's first reference to telling it to a jury, Stahl left to talk with 5-year-old Travis Roark. He returned and confronted the defendant with Travis' story that the defendant had beaten Christie.

The defendant asked that Travis be brought in to straighten the matter out. The detective declined to do so and continued to question the defendant as reflected by the following testimony:

Q: What else did you say?

A: We talked about the bruise. He said it was put on there by the same neighborhood children, the bruise on the face. I then informed him of the numerous bruises I had observed on the child's face at 1775 Chester Street and he at that time after I had gone over the bruises that I had observed only on the face, he agreed with me that the children had not put all of those bruises on there but then he told me that he did not want to tell me about it or did not want to tell the police about it and again he stated that he would tell the jury about it but not the police.

Q: Did you ask any more questions then?

A: Yes.

The starting point in determining whether the police scrupulously honored the defendant's *Miranda* right to cut off questioning is the following language in Chief Justice Warren's opinion for the court in *Miranda v. Arizona, supra* :

Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

384 U.S. at 473–74, 86 S.Ct. at 1627–28, 16 L.Ed.2d at 723. Moreover, "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy

burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination..." *Id.* 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724.

I cannot agree with the trial court that the defendant's response to the request that he tell the officers about the spanking did not *indicate* that Mr. Roark was terminating the questioning. It was at least an *indication* that he did not wish to talk about the spanking. As such, at a minimum it raised an ambiguity whether the defendant was willing to allow the questioning to continue. Under those circumstances, scrupulous regard for the defendant's Fifth Amendment privilege requires that the interrogating officer specifically inquire whether the defendant wishes to remain silent or is willing that the questioning continue. Such a procedure is necessary to determine whether the defendant's waiver of his right to remain silent, a waiver which the government has a heavy burden to establish in the first instance, remains effective. I would hold that such an inquiry is constitutionally mandated whenever in the course of uncounseled custodial interrogation a defendant is ambiguous about whether he wishes the questioning terminated. Other courts have adopted or indicated approval of this procedure. *See Nelson v. McCarthy*, 637 F.2d 1291 (9th Cir. 1980), *cert. denied*, 451 U.S. 940, 101 S.Ct. 2021, 68 L.Ed.2d 327 (1981); *United States v. Riggs*, 537 F.2d 1219 (4th Cir. 1976); *State v. Ayers*, 433 A.2d 356 (Me.1981); *cf. Thompson v. Wainwright*, 601 F.2d 768 (5th Cir. 1979) (ambiguity as to invocation of right to counsel at the initiation of custodial interrogation); *United States v. Nielsen*, 392 F.2d 849 (7th Cir. 1968) (ambiguity as to invocation of right to counsel at the initiation of custodial interrogation); *United States v. Chansriharaj*, 446 F.Supp. 107 (S.D.N.Y. 1978) (ambiguity as to invocation of right to counsel at the initiation of custodial interrogation); *see generally* Casenote, *Invocation of Miranda Rights: A Question of Fact?: Fare v. Michael C.*, 21 B.C.L.Rev. 922 (1980).

I would hold that in absence of an inquiry to determine whether the defendant was seeking to cut off questioning the continuation of the questioning violated the defendant's rights under *Miranda v. Arizona, supra*, and the suppression of all statements by the defendant after his indication that he preferred to tell it to a jury is mandated. Justice Rovira, however, in his separate opinion expresses the holding of the majority of this court to the contrary.

## H.

■ The defendant tendered an instruction at the guilt trial to the effect that evidence of intoxication may be considered in determining "knowing mental culpability." Instead, the trial court instructed the jury that self-induced intoxication is not a defense to felony murder, second-degree sexual assault, or child abuse. While evidence of self-induced intoxication is relevant to specific intent crimes, it is not relevant to general intent crimes, *i.e.*, those requiring a culpable mental state of "knowingly." *People v. DelGuidice*, 199 Colo. 41, 606 P.2d 840 (1979). Therefore, it is necessary to determine the culpable mental state required to commit the crimes charged in order to determine the propriety of the instruction. The only culpable mental state for felony murder is the intent to commit the underlying felony—here, second-degree sexual assault. The culpable mental state for second-degree sexual assault is "knowingly." At the time of the offense, however, the culpable mental state for child abuse was stated in the alternative as "knowingly, intentionally, or negligently." [11] The defendant was charged, and the jury was instructed, in terms which would have permitted conviction if any of those culpable mental states had been proved.

■ The jury, therefore, should have been instructed that they could consider evidence of self-induced intoxication as bearing on the defendant's ability to act intentionally, but could not consider it for

11. The *mens rea* for child abuse has been amended and now provides that one must act "knowingly, recklessly, or through criminal negligence." *See* n.10, *supra*.

the purpose of determining whether the defendant acted knowingly or negligently. Neither the instruction given by the court nor the one tendered by the defendant included that distinction. In instructing the jury on retrial, that distinction must be observed.

## I.

The defendant tendered, and the court rejected, an instruction to the effect that evidence of impaired mental condition not so severe as legal insanity can be considered as bearing on the capacity of the accused to act "knowingly." [12] In *People v. Ledman*, Colo., 622 P.2d 534 (1981) we confirmed that sections 18–1–803 and 805, C.R. S.1973 (1978 Repl.Vol. 8) establish that impaired mental condition is an affirmative defense and limit that defense to specific intent offenses. *Accord, People v. Morgan*, Colo., 637 P.2d 338 (1981); *People v. Gallegos*, Colo., 628 P.2d 999 (1981). Therefore, to the extent that the tendered instruction would have permitted the jury to have considered impaired mental condition as an *affirmative defense* to the general intent crimes of felony murder, second degree sexual assault, or the forms of child abuse that require a defendant to have acted knowingly or negligently, the instruction was properly refused.

In *People v. Ledman, supra*, we specifically reserved decision on the question whether evidence of impaired mental condition is admissible as relevant to the issue whether a defendant acted "knowingly," the culpable mental state for general intent crimes. In *People v. Morgan, supra*, and *People v. Gallegos, supra*, it was not necessary to address that reserved question.[13]

Here, as in *Ledman, Morgan*, and *Gallegos*, evidence of the defendant's impaired mental condition was received without any instruction limiting its applicability to specific intent crimes. Under such circumstances, to have given the defendant's tendered instruction could have placed inappropriate emphasis on this evidence as it might relate to general intent even if it is relevant to a general intent determination. We conclude, therefore, that the trial court acted within its discretion in rejecting the tendered instruction to the extent that it relates to the use of impaired mental condition evidence to determine the existence of the requisite *mens rea* for general intent crimes.

As in the case of self-induced intoxication, evidence of impaired mental condition is relevant to the form of child abuse that requires the mental state of "intentionally." The defendant was entitled to an instruction to that effect. The jury should be instructed on that issue on retrial if appropriate in light of the evidence there adduced.

## IV.

The defendant asserts other errors that we do not address because a retrial on the issue of guilt is necessary for other reasons and the asserted errors are not likely to recur or are rendered moot by our holding that the extreme indifference murder statute is unconstitutional.[14]

We affirm the determinations that the defendant was sane at the time of alleged commission of the offenses charged, reverse the defendant's judgment of conviction and

**12.** The tendered instruction reads as follows:
Evidence if (sic) an impaired mental condition though not legal insanity may be offered in a proper case as bearing upon the capacity of the accused to form knowing mental culpability if such is an element of the offense charged.

**13.** While we recognize the possibility that the question of admissibility of impaired mental condition evidence on the question whether the defendant acted knowingly or negligently could arise on retrial, we consider it inadvisable to

address it here because of the absence of factual context.

**14.** These claimed defects include denial of a motion for a continuance of the guilt trial, allegedly deficient jury instructions on extreme indifference murder, failure to instruct the jury on lesser included offenses under the extreme indifference murder charge, and a double jeopardy violation based on the defendant's convictions of both extreme indifference murder and felony murder.

remand this case to the trial court for further proceedings consistent with this opinion.

Justice LOHR delivering the majority opinion on all issues except that presented in part III–G of the opinion, and dissenting to Justice ROVIRA'S majority opinion on that issue. Justice DUBOFSKY and Justice QUINN concur in all parts of Justice LOHR'S opinion. Chief Justice HODGES, Justice LEE, and Justice ROVIRA concur in all parts of Justice LOHR'S opinion except Part III–G.

Justice ERICKSON concurring in part and dissenting in part.

Justice ROVIRA delivering the majority opinion on the issue presented in Part III–G of Justice LOHR'S opinion. Chief Justice HODGES, Justice LEE, and Justice ERICKSON concur in Justice ROVIRA'S opinion on the issue presented in Part III–G of Justice LOHR'S opinion.

ERICKSON, Justice, concurring in part and dissenting in part:

I concur with part II of Justice Lohr's opinion for the Court which affirms the determination of sanity. I also concur with parts III–A and III–E of the opinion which reverses the defendant's conviction on the grounds that the extreme indifference murder statute is unconstitutional and the testimony of the psychiatrist at the trial violated the defendant's privilege against self-incrimination. I join Justice Rovira in his opinion that the defendant's Fifth Amendment privilege against self-incrimination was not violated by the police questioning in this case.

I do not agree, however, with that part of the opinion which addresses issues which may occur in the course of a new trial and which are not essential to our decision. I would restrict the court's decision reversing the defendant's conviction to the analysis in parts III–A and III–E, and I dissent to that part of the opinion which is directed at issues which may arise in a new trial. Some of the issues which are addressed may not arise in the course of a new trial and

may have a different factual predicate than that developed during the defendant's initial trial.

ROVIRA, Justice, concurring in part and delivering the majority opinion on the issue presented in Part III–G of Justice Lohr's opinion.

We concur except as to Part III–G. Further, for the purposes of this majority opinion, we adopt the statement of the facts and issue as set forth in Part III–G of Justice Lohr's opinion.

It is clear that the defendant has the right to cut off questioning and reassert his rights under the Fifth Amendment at any time. In addition, once invoked, the right to cut off questioning must be scrupulously honored. *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, we believe that the defendant failed to invoke his right to cut off questioning. Accordingly, the police properly continued the interrogation of the defendant.

When the officers inquired about the spanking of the child, the defendant responded with a question: "Why should I tell you about it when I can tell a jury about it?" This reply cannot be construed to be an indication that the defendant wished to terminate the questioning. "*Miranda* should not be read so strictly as to require the police to accept as conclusive any statement, no matter how ambiguous, as a sign that the suspect desires to cut off questioning." *Lamb v. Commonwealth*, 217 Va. 307, 312, 227 S.E.2d 737, 741 (1976). *See also Vail v. State*, 599 P.2d 1371 (Alaska 1979); *State v. House*, 54 Ohio St.2d 297, 376 N.E.2d 588 (1978).

In the present case, it is uncontested that the defendant was fully advised of his rights, including the right to stop the interrogation at any time. Further, the trial court found that the defendant knowingly, intelligently, and voluntarily waived his right to remain silent. Under these circumstances, had the defendant wished to termi-

nate all further interrogation, he easily could have done so by simply stating that he did not want to answer any further questions. *State v. Nichols*, 212 Kan. 814, 512 P.2d 329 (1973); *Lamb v. Commonwealth, supra; Akers v. Commonwealth*, 216 Va. 40, 216 S.E.2d 28 (1975).

There is ample support in the record for the trial court's finding that the defendant's response did not indicate that he wished to terminate the questioning. Furthermore, there are no allegations of any coercion or undue influence exerted by the police officers. Accordingly, we will not disturb the ruling of the trial court, and we conclude that since the defendant's rights were scrupulously honored the admission of his statement was proper.

HODGES, C. J., and LEE and ERICK-SON, JJ., concur.