IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 18, 2006 Session

## STATE OF TENNESSEE v. CHARLES L. WILLIAMS

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2003-D-3000     Monte Watkins, Judge**

_____

**No. M2005-00836-CCA-R3-CD - Filed November 29, 2006**

_____

This is a direct appeal as of right from convictions on a jury verdict of one count of child rape and two counts of rape. For these convictions, the Defendant, Charles L. Williams, received an effective twenty-two-year sentence in the Tennessee Department of Correction with 100% service required. On appeal, the Defendant raises six issues: (1) the trial court erred in admitting hearsay testimony of the victim; (2) the evidence was insufficient to support the jury's finding of guilt beyond a reasonable doubt on the charges of child rape and rape; (3) the trial court erred in allowing the State's DNA expert witness to speculate about the significance of the ratio of DNA discovered under the Defendant's fingernails; (4) prosecutorial misconduct requires a new trial; (5) the trial court gave erroneous jury instructions when it stated the elements of child rape could be satisfied by a showing of a mens rea of recklessness; and (6) the trial court erred in failing to merge the lesser rape convictions into the child rape conviction. We have concluded that the trial court erred by allowing certain speculative testimony by the State's DNA expert witness. We also have concluded that the prosecutor engaged in misconduct during closing argument. In addition, the two rape convictions should have been merged into the child rape conviction. We have determined that the cumulative effect of the trial errors deprived the Defendant of a fair trial. Judge Welles also concludes that the trial court erred by giving erroneous jury instructions for the requisite mens rea. We reverse the convictions and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;**
**Remanded**

DAVID H. WELLES, J., delivered the opinion of the court. JOSEPH M. TIPTON, J., concurred in the results and filed an opinion dissenting in part, in which JOHN EVERETT WILLIAMS, J., joined.

Jeffrey Devasher, Assistant Public Defender, Nashville, Tennessee, for the appellant, Charles L. Williams.

Paul G. Summers, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Brian Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTS

The convictions in this case stem from an incident in which the Defendant allegedly digitally penetrated the victim in the anus during the early morning hours of October 23, 2003, at the Nashville home of Ms. Latonya Sims (the victim's mother). The Defendant arrived at Ms. Sims' home late in the evening of October 22nd, and the two engaged in consensual sex in the same bed in which Ms. Sims' four-year-old daughter (the "victim") was asleep. Upon concluding their sexual activities, the Defendant remained in the same room with the sleeping child, and Ms. Sims went to an adjacent room. Moments later Ms. Sims heard her child say "ouch." She returned and found the victim in bed with the Defendant, who was clad only in his boxer shorts. Ms. Sims carried her child to the bathroom, where she discovered blood from an injury to the victim's buttocks area. After she was awakened, the victim stated that her "bootie hurt" and that the Defendant had "stuck" his finger in her "bootie." The police were called, and the Defendant was arrested.

In October of 2003, the Defendant was indicted by a Davidson County grand jury on three charges: rape of a child, see Tenn. Code Ann. § 39-13-522(a), and two counts of rape, see id. § 39-13-503(a).[1] In November of 2005, the Defendant received a jury trial.

During the State's proof, Ms. Sims testified that she was at her home the evening of October 21, 2003, along with her sister, her sister's four children, her brother, and her daughter the victim, who was four years old at the time. Sometime after 11:00 that evening, the Defendant, whom she had known for eight years and who went by the name "Chuck," stopped by for several minutes. The Defendant left and then returned with a friend approximately forty-five minutes after midnight. According to Ms. Sims' testimony, she was downstairs in the "living room" in a queen-size bed with her daughter, who was sleeping at the time.

Ms. Sims explained that the Defendant came downstairs, talked with her for about thirty minutes, and then the two "became intimate." They had sexual intercourse at one end of the bed while the victim slept at the other end. Ms. Sims stated that the two remained at the foot of the bed, did not change positions during intercourse, and the relations lasted fifteen to twenty minutes. Ms. Sims also testified that the victim, who was fully dressed, remained asleep throughout the entire episode and that the Defendant, who was dressed but "with his pants down," never put his hands near the victim. Ms. Sims stated that their sexual activities were interrupted and brought to an end when her brother came downstairs. Ms. Sims stated that the Defendant then pulled up his pants and went upstairs to wash, and she went to the kitchen.

Ms. Sims testified that before she went to the kitchen, which shared a common door with the living room where the bed was located, she turned the lights on in the living-room, observed her

---

[1] It is undisputed that all three charges related to the same single incident. The two rape charges allege alternate theories; count two charged rape where the victim was "physically helpless," and count three charged rape "without . . . consent." See Tenn. Code Ann. § 39-13-503 (a)(2) and (3).

daughter still asleep on the bed, and saw the Defendant, fully clothed, sitting on the couch. Ms. Sims testified that approximately fifteen minutes after entering the kitchen, she heard her child "holler ouch." She then ran to the living room, which was dark, and attempted to locate her child. She asked the Defendant where her child was, and he "pulls back the blanket as he say 'oh, here she is.'"

Ms. Sims described what she observed as follows: "When he pulled the blankets back I observed my child pants been folded down, like they was trying to get pulled back up in a hurry, but didn't have enough time to pull them back the right way." Ms. Sims stated that she was immediately concerned because when she left the room, her child was not under the covers; the lights were on, and the victim was fully clothed and on the couch. However, she found the child with the lights out in bed with the Defendant, who was "in his boxers and socks." Ms. Sims immediately "toted [the victim] upstairs to the bathroom." Ms. Sims stated that the Defendant followed her upstairs, claiming he did not know why the child said "ouch."

Ms. Sims testified that when she reached the bathroom, she "turns [the victim] over. I pulls her pants down. And I check between her legs." Finding nothing out of the ordinary in the victim's genital area, Ms. Sims stated that she was relived at first but then "something just told me to turn her over. So I turned her over, and I check her back area. And I spread her cheeks. Blood started running down my leg." Ms. Sims stated that the victim was asleep the entire time, so to wake her, Ms. Sims "had to smack her cheeks a little" and repeat "get up." When the victim opened her eyes, approximately fifteen minutes after Ms. Sims heard her say "ouch," Ms. Sims asked, "why did you yell out ouch?" The victim responded: "Mom, my bootie hurts." When asked why, the victim stated "Mom, Chuck stuck his [finger] in my bootie."[2] Ms. Sims testified that the victim also made these same statements to her sister. The Defendant denied he touched the victim, and after a heated exchange, the Defendant and his friend were asked to leave and the police were called.

Ms. Sims testified that after the police arrived, she and the victim were transported to a local hospital where the child was examined. Ms. Sims was asked several questions regarding the child's medical history. She told the hospital workers that the victim had a bowel movement earlier "that morning" after which Ms. Sims assisted in wiping, and the victim did not complain of pain nor did Ms. Sims notice any blood. Ms. Sims also testified that the Defendant had "long fingernails." On cross-examination, Ms. Sims stated that she and the Defendant did not move around on the bed during sex and that they never rolled on top of the victim.

Ms. Amanda Sims, Ms. Sims' sister and the victim's aunt, testified that on the morning of the incident she heard a "commotion" in the bathroom, went to investigate, and discovered Ms. Sims yelling at the Defendant, accusing him of molesting her child. Ms. Amanda Sims then observed the victim had blood dripping down from her buttocks. Ms. Amanda Sims testified that her brother then called the police while the Defendant, who was in his boxers, professed his innocence. On cross-

---

[2]Ms. Sims first testified that the child said "Chuck stuck his hand in my bootie," but in later testimony clarified that the child actually said "finger."

examination, Ms. Amanda Sims stated that the victim was still sleeping when she walked into the bathroom, and she witnessed her sister slap the child to wake her up.

Officer John Pepper of the Nashville Metro Police Department, testified that he was one of the first responders to the child rape dispatch call, and when he arrived he found Ms. Sims "visibly upset." He determined that the call was credible and secured the crime scene. He broadcast the description of the Defendant to other officers in the area and called Youth Services and the I.D. Unit. Officer Freddie Garrette of the Nashville Metro Police Department, testified that he found the Defendant only a short distance from Ms. Sims' home. Ms. Sims was called out and identified the Defendant, and the Defendant was taken into custody.

Detective Bret Gipson of the Nashville Metro Police Department Sex Crime Unit, testified that he responded to the child rape call, arriving on the scene at approximately 4:00 a.m. He took charge of the Defendant, read him his Miranda rights, and after the Defendant waived his rights, conducted an interview. The Defendant told him that he may have rolled onto the victim during intercourse but denied molesting the child. The Defendant told the Detective that he did not recollect putting his finger in the victim's anus but conceded the only way it could have happened was accidently while he was having sex with the victim's mother. The Defendant consented to provide DNA samples for testing in the form of a swab from the inside of his cheek and fingernail clippings but refused to provide a blood sample because he did not like needles. Det. Gipson took possession of the DNA samples and the results of the rape kit performed on the victim and submitted them to the Tennessee Bureau of Investigation (TBI) for analysis. Det. Gipson stated that the Defendant had long fingernails.

Dr. Maureen Sanger, a psychologist with Our Kids Center, testified that she interviewed the victim's mother and accompanied the victim to the examination room at the hospital. Dr. Sanger stated she did not interview the victim at that time due to her young age, but the victim voluntarily told Dr. Sanger that her "bootie hurt."

Ms. Sue Ross, a nurse practitioner with Our Kids Center, was certified an expert as a pediatric forensic nurse practitioner and testified that she examined the victim several hours after the incident was said to have occurred. The victim's medical history, as reported to her, was that the victim's anus had been digitally penetrated. Ms. Ross testified that she made "no significant finding" from a genital examination of the victim, but she found "an acute fissure, or shallow tear" in the victim's "anal area." She further described the injury as "two breaks in the skin with intact skin bifurcating the fissure, or tear," and noted that this type of injury was "unusual." Ms. Ross noted that the injury had been inflicted within twenty-four hours of her examination, but there was no active bleeding during the exam. However, Ms. Ross stated that Ms. Sims reported bleeding and that what appeared to be blood stains were on the victim's underwear.

Ms. Ross opined that the victim's injury was not consistent with those common to a hard bowel movement, but it would be "reasonable to assume" it was the type of injury that would occur by digital penetration with long fingernails. Ms. Ross noted that often there are no physical injuries

resulting from a digital penetration of the anus, but long fingernails would be more likely to produce an injury. Ms. Ross also stated that the injury was likely to have caused pain, and that there was a "good chance" that the victim's skin cells would show up under the fingernails of the person who anally penetrated her. Ms. Ross clarified that the injury was "within the anal, rugal folds."

On cross-examination, Ms. Ross testified that the injury was between two and five millimeters in length and the testing apparatus she used to examine the injury is "purely an external device." Ms. Ross concluded that "[t]here was nothing about [the fissure] that made me concerned about any other internal injury." Ms. Ross also conceded that injuries to this area of the anal region can happen during bowel movements but stated on re-direct that the victim's injury was more consistent with a fingernail injury than an injury caused by stool.

Following a jury-out challenge by the Defendant to the admissibility of the testimony to be presented by the State's DNA expert, Mr. Chad Johnson, a Special Agent Forensic Scientist with the TBI, was certified as an expert in the field of forensic science and DNA analysis and allowed to testify concerning the DNA evidence obtained from the Defendant's samples. Agent Johnson testified that he ran tests on both the scrapings from under the Defendant's fingernails and the clippings themselves and compared the DNA profiles he found from these samples with the known standard obtained from a blood sample from the victim and the "mucal swab" sample taken from the Defendant. Agent Johnson determined that the left hand scrapings and the right hand clippings both contained a mixed profile in which the major DNA contributor was the victim and the Defendant was a minor DNA contributor. On the right hand scrapings, the victim and Defendant were major contributors and an unknown person was the minor DNA contributor, and the left hand clippings contained only the Defendant's DNA. Agent Johnson stated that the statistical probability that the DNA profiles he developed from testing the samples belonged to someone other than the people he identified exceeded the world population.

On cross-examination, Agent Johnson admitted he did not know how any of the DNA found under the Defendant's fingernails got there but opined that the amount suggested something more than "casual contact." As to the significance of more of the victim's DNA being present under the left-hand scrapings and right hand clippings than the Defendant's own DNA, Agent Johnson first testified that he did not know what the ratio meant. However, when pressed on re-direct, Agent Johnson stated he "would think" that the person whose fingernails were being scraped would contribute more of their own DNA than the DNA of someone else. The Defendant moved for a motion to strike Agent Johnson's expert testimony, which was denied.

At the conclusion of the State's proof, the Defendant moved for a judgment of acquittal, which was denied. The defense presented as its only witness the testimony of the Defendant. The Defendant adamantly denied sticking his finger in the victim's anus but admitted that he "accidentally fell on" the victim while having sexual relations with Ms. Sims. He stated that he "might have shook" the victim in an attempt to wake her because he thought she was having a bad dream. Nonetheless, he never put his hands inside the victim's underwear.

The Defendant relayed his version of the events of the night in question, which varied in several crucial areas from the testimony of Ms. Sims. The Defendant testified that he knew Ms. Sims only as a casual sex partner and that he always took his clothes off when he had sex with her. The Defendant admitted he was intoxicated the night in question but still able to recall the events of the night. He stated that he had intercourse with Ms. Sims "on the bed" and not merely at "the edge of the bed." He also stated that at one point he "tipped over and [] fell on" the victim, and the victim "whine[d] a little bit." He further testified that Ms. Sims' brother interrupted several times, but they continued having sex until they concluded of their own volition.

The Defendant testified that after they finished having sex, he put on his boxers and Ms. Sims went into the kitchen. The victim was "whining" and he thought she was having a bad dream so he "shook her" and "that's when the sound came out." Ms. Sims raced into the room and took the victim upstairs. He followed, and Ms. Sims accused him of molesting the victim. He denied this and wanted to stay until the police came to profess his innocence. However, Ms. Sims' sister told him he had to leave and so he left the house but remained in the neighborhood. The Defendant stated he was "shocked" to be accused of molesting a child because he has small children of his own. He also explained that he had repeatedly told Det. Gipson that he did not touch the victim inappropriately. After a lengthy interrogation, the Detective asked if it was possible that he accidentally poked the victim, and he answered affirmatively because he thought "anything is possible." On cross-examination, the Defendant stated he and Ms. Sims were engaged in sexual activities for three hours, and he did not go upstairs to wash afterwards nor turn off the lights as Ms. Sims testified.

During closing arguments, the State argued that the reason more of the victim's DNA was found under the fingernails of the Defendant's left hand was because the Defendant was laying on his right side and used his left hand to "digitally penetrate the anus of a small child." The prosecutor also informed the jury that his "nineteen years" representing "the most vulnerable victims . . . little children" taught him that sex offenders, unlike drug dealers and murderers, deny committing their crime.

At the conclusion of the trial, the court instructed the jury, including instruction that the elements for child rape could be met by proof the Defendant acted "intentionally, knowingly or recklessly." The jury returned a verdict of guilty for all three charges, and the trial court noted on record that the counts "will merge." The Defendant filed motions for a judgment of acquittal and new trial, which were denied. At a March 4, 2005 sentencing hearing, the court entered judgments of conviction against the Defendant for all three charges, imposing eight-year sentences for the two rape convictions and running them concurrent with the twenty-two-year sentence for the Defendant's child rape conviction. This appeal followed.

## ANALYSIS

On appeal, the Defendant argues that the trial court erred in admitting hearsay evidence, allowing speculative testimony from the State's DNA expert, incorrectly instructing the jury, and failing to merge the convictions. The Defendant also claims that he is entitled to a new trial due to

prosecutorial misconduct and that the State failed to present sufficient evidence for any rational trier of fact to find beyond a reasonable doubt that he was guilty of the offense of child rape. We conclude that the trial court did err by allowing improper expert testimony into evidence, by incorrectly instructing the jury, and by allowing prosecutorial misconduct. We further conclude that the cumulative effect of these errors affirmatively appears to have affected the result of the trial on the merits. Accordingly, we reverse the convictions and remand the case for a new trial.

## I. Admissibility of Hearsay Evidence.

In the first issue on appeal, the Defendant asserts that the trial court erred "in admitting hearsay testimony by the alleged victim under either the 'excited utterance' or 'state of mind' hearsay exceptions." At trial, Ms. Sims was allowed to testify that the victim said "ouch," then approximately fifteen minutes later upon being awakened, said "my bootie hurts" and "Chuck stuck his [finger] in my bootie." The Defendant objected at trial to the latter two statements, but following a jury-out hearing, the trial court ruled that the hearsay testimony was admissible under the "state of mind" exception to the hearsay rule. See Tenn. R. Evid. 803(3). At the hearing on the motion for a new trial, the trial court upheld his prior ruling, but stated that the hearsay evidence was admissible as an "excited utterance." See Tenn. R. Evid. 803(2).

The Defendant does not challenge the admission of the hearsay evidence that the victim cried "ouch." However, the Defendant argues that the other two hearsay statements were erroneously admitted because they fail to meet the requirements of either the state of mind exception or the excited utterance exception to the general rule that hearsay is not admissible. Additionally, the Defendant also claims the admission of the statements violated his constitutional confrontation rights. The State concedes in its appellate brief that some of the hearsay statements fail to qualify for the state of mind exception but argues that all of the statements were nevertheless admissible as excited utterances. The State also maintains that because the hearsay statements were non-testimonial, their admission did not violate the Defendant's confrontation rights.

### A. State of Mind Exception

Tennessee Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Generally, "[h]earsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802. Nevertheless, certain nontestimonial statements, due to the special circumstances under which they were made that imbue them with guarantees of reliability and trustworthiness, have long been recognized as exceptions to the hearsay rule. One such exception to the hearsay rule is the state of mind exception. Tennessee Rule of Evidence 803(3) allows the admission of "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition, (such as intent, plan, motive, design, mental feeling, pain, and bodily health)." However, the Advisory Commission Comments to this section note that "only the declarant's conduct, not some third party's conduct, is provable by this hearsay exception." Id. Accordingly, we conclude that the victim's hearsay statement "my bootie hurts" was admissible as an "existing state of mind, emotion, sensation, or physical condition." However, the hearsay statement "Chuck stuck his [finger] in my bootie," identifying a "third party's conduct," was not

admissible under the state of mind exception.  See State v. Farmer, 927 S.W.2d 582, 595 (Tenn. Crim. App. 1996) (holding the state of mind exception assumes "the declarant's own state of mind [is] relevant to a material issue" but excludes hearsay testimony admitted to prove a third party's conduct).

### B. Excited Utterance Exception

Another long recognized exception to the general hearsay rule is the excited utterance exception governed by Tenn. R. Evid. 803(2), which admits statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." This Court has noted that the "underlying theory of this exception is that circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication." State v. Land, 34 S.W.3d 516, 528 (Tenn. Crim. App. 2000). For a statement to qualify as an excited utterance, three general criteria must be established: (1) there must be a startling event or condition that causes the stress of excitement; (2) the statement must relate to the startling event or condition; and (3) the statement must be made while the declarant was under the stress of excitement. Id. at 528-29 (citing  Neil P. Cohen et al., Tennessee Law of Evidence § 803(2).2, at 533-34 (3d ed. 1995)). See also State v. Gordon, 952 S.W.2d 817, 820 (Tenn. 1997).

The Defendant argues that the victim's hearsay statements fail to qualify as an excited utterance because they do not meet any of the three criteria: there was no startling event because whatever happened the victim slept through it; the victim's statements did not relate to the alleged startling event of child rape but rather related to the event of being slapped awake by her mother; and the victim was not under the stress of excitement but rather was described as "groggy." The State argues that "under the circumstances, considering the age of the child and her obviously tired condition, her slumber should not be considered to negate the excitement caused by the Defendant's action." Thus, the State argues, the intervening circumstances between the event of the rape and the statements of the victim do not disqualify the victim's hearsay statements from being admissible as an excited utterance.

To determine whether the unique facts of this case support a finding that the victim's statements qualified as an excited utterance, we will review the three criteria with the twofold rationale for this hearsay exception in mind:

> First, since this exception applies to statements where it is likely there was a lack of reflection-and potential fabrication-by a declarant who spontaneously exclaims a statement in response to an exciting event, there is little likelihood, in theory at least, of insincerity . . . .  Second, ordinarily the statement is made while the memory of the event is still fresh in the declarant's mind. This means that the out-of-court statement about an event may be more accurate than a much later in-court description of it.

Gordon, 952 S.W.2d at 819-20 (quoting Cohen et al., supra, § 803(2).1, at 532).  We conclude that the first criterion is met; there was a startling event, i.e., the penetration of the victim's anus.  Our

supreme court has noted that "any event deemed startling is sufficient," and therefore, the act of child rape at issue in this case would most certainly qualify as a startling event. Id. at 820. The Defendant's argument that no startling event took place because whatever happened the victim "slept through the alleged event" fails because there is no evidence the victim was sleeping at the time of the event. Indeed, the Defendant does not make the claim that the statement "ouch" was made while the victim was asleep but rather concedes that this hearsay testimony "is admissible." We conclude that the record supports the inference that the victim's hearsay statements related to the startling event of being digitally penetrated in the anus.

Second, we conclude that the hearsay statements in this case "relate to" the startling event. The Defendant argues that being slapped awake by her mother would be a "startling event" but the victim's statements did "not relate to this event." The hearsay statements relate to the startling event of the rape, not the event of being awakened. Moreover, our supreme court has held that while the "startling event" is usually the act upon which the legal controversy is based, the excited utterance exception "is not limited to statements arising directly from such events; rather, a subsequent startling event or condition which is related to the prior event can produce an excited utterance." Gordon, 952 S.W.2d at 820. Thus, even if the victim's statements were made pursuant to the "subsequent startling event" of being awakened, this event, as well as the victim's statements, clearly "related to the prior event" of being raped by the Defendant.

The third criterion, that the victim's statements were made while she was under the stress or excitement from the startling event, is the most difficult to discern under the facts of this case. We note that our supreme court has instructed that whether a statement was made while under the stress of excitement is the factor "most directly" related to the underlying rationale for the excited utterance hearsay exception. Gordon, 952 S.W.2d at 820. Accordingly, Tennessee courts, as well as courts in other jurisdictions faced with similar quandaries, have looked to multiple circumstances or factors in determining whether a statement was made under stress or excitement and therefore imbued with indicia of reliability. Unquestionably, one of the most significant factors examined is the time interval between the startling event and the utterance of the statement. Our supreme court has held that "[t]he ultimate test is spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication." State v. Smith, 857 S.W.2d 1, 9 (Tenn. 1993). The Corpus Juris Secundum notes that "spontaneity is the key factor in determining whether a statement falls within the excited utterance exception" but further explains that because "spontaneity rather than time or place of the statement [is the essential test of admissibility,] the lapse of time after the occurrence of an event is not as important as the condition of the speaker's mind." C.J.S. Evidence § 358.[3]

---

[3]The treatise further explains: "the lapse of time between the startling event and a declaration offered in evidence is relevant to a determination whether the declaration was spontaneous and instinctive, or premeditated and deliberative." C.J.S. Evidence § 358.

However, several other factors have also been outlined by our supreme court as relevant to the determination of whether a statement was made under the stress of excitement, including: (1) the nature and seriousness of the event; (2) the circumstances of the declarant including such characteristics as age and physical and mental condition; and (3) the contents of the statement itself. See Gordon, 952 S.W.2d at 820. Additionally, the American Law Reports, in an article on excited utterance exceptions to victim's hearsay statements in sex crime cases, noted these same factors and several others used in outside jurisdictions, including "whether the statement in question was made to the first person encountered following the event or at the first opportunity." W.A. Harrington, Annotation, Time Element as Affecting Admissibility of Statement or Complaint Made by Victim of Sex Crime as Res Geste, Spontaneous Exclamation, or Excited Utterance, 89 A.L.R. 3rd 102, at § 2[a] (1979). It is with these factors in mind that we examine whether a child victim who made statements approximately fifteen minutes after the startling event, and fell asleep during the interim, made such statements under stress or excitement. We will briefly examine the analysis courts of other states have applied to similar facts.

The Oklahoma Court of Criminal Appeals found that hearsay statements made by a two-year-old victim of child abuse did not qualify as an excited utterance where the victim slept ten to twelve hours between the event of the abuse and his report of this incident. See McCalip v. State, 778 P.2d 488, 490 (Okla. Crim. App. 1989). The Oklahoma court found the hearsay statements were not made "under the stress of the startling event" because there was "no evidence" the victim "was emotionally upset or excited at the time of the statement." Id. Additionally, the court found the fact that the victim "slept soundly through the night makes it less probable that his statement the next morning was made while he was under the stress of a startling event," and also noted that the victim's statement was not "spontaneously volunteered" upon awakening but rather in "response to questioning by his mother." Id. Similarly, the Connecticut Supreme Court found that a sex crime defendant's statements did not qualify for the excited utterance exception to the hearsay rule because they were not "spontaneous." See State v. Kelly, 770 A.2d 908, 936 (Conn. 2001). The court held that because one and one-half hours had passed between the event and being awakened, the defendant had "ample time for reasoned reflection" and therefore failed to meet "his burden of proving that he did not have an opportunity to think about and fabricate a story that night after the assault." Id.

However, other courts have found that hearsay statements made by a child after falling asleep between the event and the declaration do qualify as an excited utterance. The Colorado Supreme Court held that the hearsay statements of a five-year-old child qualified as an excited utterance where twelve hours, during some of which the child was asleep, had passed between the event and the declaration. See People v. Roark, 643 P.2d 756, 760 (Colo. 1982). The court found that "contemporane[ousness] is not strictly required" and it was "the spontaneous character of the statement" that mattered. Id. Additionally, the court noted that "'considerable latitude in temporal proximity is particularly evident in cases involving assertions by very young children after a stressful experience . . . [because] children of tender years are generally not adept at reasoned reflection and at concoction of false stories under such circumstances.'" Id. (quoting Lancaster v. People, 615 P.2d 720, 723 (Colo. 1980)). Similarly, the Ohio Court of Appeals held that the statements of a six-year-

old sex crime victim were excited utterances even though they were made after the child had slept for approximately seven hours between the event and her declaration. See State v. Humphries, 607 N.E.2d 921, 927 (Ohio Ct. App. 1992). The court noted that "[t]ime is not necessarily the controlling factor in determining whether a statement qualifies as an excited utterance" but rather whether or not "circumstances" demonstrated the declaration was "from impulse rather than reason and reflection." Id. (citation omitted). The court noted that the victim made the statements "[i]mmedialtly after waking" and without coercive questioning, which tended to show the declarant had no opportunity to reflect and was still in a state of excitement over the startling event. Id. at 927-28.

In this case, the evidence reveals that the victim made her declarations after being awakened approximately fifteen minutes after the "startling event" of being digitally penetrated in the anus. We conclude that the fifteen-minute time interval between the startling event and the victim's declaration does not preclude the hearsay statements from qualifying for the exited utterance exception. See Gordon, 952 S.W.2d at 820 (stating "[t]he time interval is but one consideration in determining whether a statement was made under stress or excitement"). See also 89 A.L.R.3d 102, supra, at § 2[a].[4]

The fact that the child was awakened from sleep and described as "groggy" at the time some of the hearsay statements were made is more problematic. The first statement uttered by the victim was the exclamation "ouch," which by its very nature implies a state of stress or excitement, normally due to an event associated with the infliction of pain. Additionally, the evidence suggests the victim remained in a state of excitement from the startling event when she was awakened fifteen minutes later because her first response was a reaffirmation of physical pain resulting from the event, as evidenced by the statement "my bootie hurts." Furthermore, Ms. Sims testified that the victim was "whiny" and "whining" when she made her declarations, indicating she was in pain from the anal rape, further evidence from which the trial court could properly infer the victim was still laboring under the stress of the startling event. Accordingly, the record does contain additional evidence of the victim's statements being spontaneous or made while still under the stress or excitement of the event.

Significantly, other factors outlined by our supreme court and relied on by other jurisdictions also weigh in favor of a finding that the victim's statements were made with spontaneity and therefore carry an indicia of reliability. The circumstances of the event tend to support the conclusion that the statements were made spontaneously upon being awakened; the child had been

---

[4] The American Law Reports note that declarations by the victim of a sex offense have been "almost uniformily" held to qualify as excited utterances where "little or no appreciable time intervened between the offense and the utterance"; statements about events "occurring up to twenty minutes prior" also generally qualify for the exception "except where circumstances were such to indicate a lack of spontaneity"; and statements made an hour or several hours after the event have been held admissible "where they were shown to have been spontaneously uttered." However, statements made a day or later after the event by "adult victims" are generally not considered excited utterances, but in cases involving an "infant or minor" victim, courts have allowed statements of a day or more later to qualify for the exception. Id.

sound asleep prior to the incident as opposed to being awake and then falling asleep after the event. Because of the child's young age, four years old at the time of the rape, the examination of the temporal proximity of the event and declaration merits considerable latitude. We agree with the observation of the Colorado Supreme Court that young children, especially following stressful experiences, are not adept at reasoned reflection and are therefore less apt to concoct false stories. See Roark, 643 P.2d at 760. Additionally, we note that the very first thing the victim said upon being awakened was "my bootie hurts" followed by a statement implicating the Defendant. We also note that these statements were not the result of coercive questioning but rather the answers to the innocuous questions of "what's wrong" and "why did you holler ouch." In sum, we conclude that the record supports the trial court's finding that the victim's statements were made after a startling event, related to that event, and were made while the victim was under the stress or excitement of the event. Accordingly, the trial court did not err by admitting the hearsay statements at issue pursuant to the excited utterance exception. This issue is without merit.

### C. Confrontation Rights

The Defendant also asserts that the admission of the victim's hearsay statements violated his Sixth Amendment right to confront adverse witnesses. In support of this claim, the Defendant argues that Crawford v. Washington, 541 U.S. 36 (2004), requires that before a testimonial hearsay statement may be admitted, the unavailability of the witness must be demonstrated and the defendant must have been given a prior opportunity to cross-examine. The Defendant, without citation to supporting authority, argues that the hearsay statements in this case were "testimonial" because (1) they were the strongest evidence against the Defendant, (2) the victim never testified at any proceedings, and (3) the Defendant never had the opportunity to cross-examine the victim. The Defendant also argues that his right to confront adverse witnesses under the Tennessee Constitution was violated. The State argues that the hearsay testimony at issue was not testimonial and therefore not subject to Crawford's requirements. The State further argues that because the statements were reliable the Defendant's confrontation rights were not violated, and even if it was error to admit the statements, it was harmless error.

The Sixth Amendment guarantees an accused the right to be "confronted with the witnesses against him." U.S. Const. amend VI. The Tennessee Constitution guarantees the right of a defendant to "meet the witnesses face to face." Tenn. Const. art. I, § 9. Furthermore, our supreme court noted that Crawford bolstered criminal defendants' long-standing confrontation rights by clarifying in 2004 that "'testimonial' out-of-court statements by a nontestifying declarant may be admitted only if the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant." State v. Gomez, 163 S.W.3d 632, 641 (Tenn. 2005).

In his appellate brief, the Defendant acknowledges that this Court has in the past held, as a per se rule, that hearsay statements properly admitted pursuant to the excited utterance exception do not violate the guidelines set out in Crawford. See State v. Larrie Maclin, No. W2003-03123-CCA-R3-CD, 2005 WL 313977, at *17 (Tenn. Crim. App., Jackson, Feb. 9, 2005); State v. Michael Lebron Anderson, No. E2004-00694-CCA-R3-CD, 2005 WL 171441, at *4 (Tenn. Crim. App., Knoxville, Jan. 27, 2005) (holding that "the essential characteristics that cause [hearsay] statements

-12-

to fall within the ambit of the excited utterance exception conflict with the characteristics that would make them testimonial."); see also State v. Jose Luis Quintero, No. M2003-0231-CCA-R3-CD, 2005 WL 941004, at *12 (Tenn. Crim. App., Nashville, Apr. 22, 2005) (citing to Anderson and concluding, "[a]ccordingly, if we conclude that [the witness'] statements . . . were excited utterances, then Crawford does not avail the Defendant."). However, as recognized in the State's brief, our supreme court recently rejected this Court's holdings in Maclin and Anderson that an excited utterance is by its very nature nontestimonial. In State v. Maclin, 183 S.W.3d 335, 351 (Tenn. 2006), our high court rejected this per se rule, stating:

> We favor an approach that considers both the testimonial hearsay analysis and the excited utterance analysis and that considers the totality of the circumstances in order to determine whether a particular excited utterance should be deemed testimonial. The primary consideration under such an approach remains whether the declarant was acting as a "witness"--that is, "bearing testimony" against the accused. To this end, we adopt the definition of "testimony" referenced by the Supreme Court in Crawford: "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" Crawford, 541 U.S. at 51, 124 S.Ct. 1354 (quoting Webster). We also note that Crawford emphasized that the types of statements the Court considered "testimonial" were those formal types of statements--including those made in a police interrogation--that a reasonable declarant would expect to be used prosecutorially or at trial. Id. at 51-52, 124 S.Ct. 1354.

Accordingly, we must examine the "totality of the circumstances" in this case.

There was no showing that the victim was unavailable to testify, and it is clear that the Defendant did not have a prior opportunity to cross-examine the victim. However, these twin Crawford requirements are not required in this case because we conclude that the victim's testimony was not "testimonial." As our supreme court recently stated:

> After Crawford, the threshold question in any Confrontation Clause case is whether a challenged statement is testimonial or nontestimonial. If it is testimonial, the statement is inadmissible unless (1) the declarant is unavailable and (2) the accused had a prior opportunity to cross-examine the declarant. Id. If it is not testimonial, then the states are free to apply their own hearsay law to determine the statement's admissibility.

Maclin, 183 S.W.3d at 245 (footnote omitted). The court noted that Crawford "defined 'testimony' as typically a 'solemn declaration or affirmation made for the purpose of establishing or proving some fact,'" but "declined to give a comprehensive definition of what it meant by 'testimonial' statements." Id. (citing Crawford, 541 U.S. at 68). Accordingly, the court embarked on a comprehensive review of "courts across the nation" which have grappled with the same problem: how to determine what is testimonial. The court noted with favor that "[i]n general, child witness

-13-

statements made to government officials or representatives have been characterized as testimonial, while statements made to relatives or friends have been characterized as nontestimonial." Id. at 347 n.12.[5]  The court further noted that even when dealing with adult witnesses, "[n]umerous courts have determined that statements made to friends, family, or acquaintances, as opposed to a government representative, do not constitute testimonial hearsay." Id. at n.13.  In the end, our high court rejected a per se rule in favor of a "case-by-case approach" based on an "objective standard--that is, whether the statement was made 'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" Id. at 349 (quoting Crawford, 541 U.S. at 52).

In this case, the victim, a young child, made her declarations to her mother in the bathroom of her own home because she was in pain and her mother asked her why.  Under these circumstances, no "objective witness" could "reasonably" believe these simple statements were uttered by a child for use at a future criminal trial.  Therefore, we conclude they were not testimonial. Nevertheless, as clarified by our supreme court, a confrontation right claim is not extinguished by a mere finding that a statement was nontestimonial:

> If the statement is non-testimonial, the Confrontation Clause analysis does not end. Instead, consistent with Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597, the court must determine whether the out-of-court statement bears adequate indicia of reliability--specifically, whether it falls within a "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness."

Id. at 351 (quoting Crawford, 541 U.S. at 68).  In this case, the child victim's statements were admitted as excited utterances, a firmly rooted hearsay exception, and also bear particularized guarantees of trustworthiness.

Both the United States Supreme Court and this Court have held that the excited utterance exception is firmly rooted.  See White v. Illinois, 502 U.S. 346, 355 n.8 (1992); State v. Taylor, 771 S.W.2d 387, 393-94 (Tenn. 1989).  Accordingly, the issue of whether the Defendant's confrontation rights were violated turns on whether the hearsay statements of the child victim were excited utterances under Tennessee Rule of Evidence 803(2).  Because we have already concluded that the statements at issue qualify for the excited utterance exception to the general rule precluding hearsay, we also conclude the Defendant's confrontation rights under the Sixth Amendment and right to "meet the witness face to face" under article I, section 9 of the Tennessee Constitution were not

---

[5]To support this general rule, the Maclin Court cited the following cases:  People v. Sisavath, 118 Cal. App. 4th 1396, 13 Cal. Rptr. 3d 753, 757-58 (2004); People v. Vigil, 104 P.3d 258, 262 (Colo. Ct. App. 2004), cert. granted, (Colo., Dec. 20, 2004); State v. Snowden, 867 A.2d 314, 325-26 (Md. 2005); Flores v. State, 120 P.3d 1170, 1178-79 (Nev. 2005).

violated by the admission of the nontestimonial excited utterance of the victim.[6] This issue is without merit.

## II. Sufficiency

The Defendant next claims that the evidence contained in the record is insufficient to support a finding by a rational trier of fact that he is guilty beyond a reasonable doubt of rape of a child or rape. To support this assertion, the Defendant argues that the State failed to prove "sexual penetration," a required element of both rape and child rape.[7] The Defendant asserts that the only evidence of penetration submitted at trial was inadmissible hearsay. The Defendant further argues that the medical testimony admitted at trial proves only an injury to the "outside" area of the victim's anus, and therefore would support, at most, a conviction for attempted child rape. The State argues that sexual penetration was proved beyond a reasonable doubt, citing to the hearsay evidence the court admitted pursuant to the excited utterance exception, the medical evidence of an injury inside the buttocks of the victim, and substantial circumstantial evidence.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from

---

[6]We note that the Tennessee Supreme Court has determined that the analysis it outlined in Maclin applies to issues raised under both the Sixth Amendment confrontation clause and the "face to face" guarantee in the Tennessee Constitution. See Maclin, 183 S.W.3d at 354.

[7]The Defendant does not assert on appeal that the State failed to prove the other requisite elements for a conviction of child rape and rape.

circumstantial evidence for those drawn by the trier of fact. <u>See</u> <u>Evans</u>, 108 S.W.3d at 236-37; <u>Carruthers</u>, 35 S.W.3d at 557.

The offenses of which the Defendant was convicted, child rape and rape, both require the prosecution to prove the element of "sexual penetration." Tenn. Code Ann. §§ 39-13-522(a) and -503(a). Our criminal code defines "sexual penetration" for the purposes of these offenses, in relevant part, as "any . . . intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body . . . ." <u>Id.</u> § 39-13-501(7).

The Defendant's sufficiency argument fails to gain him relief. First, we do not agree with the Defendant's assessment of the record that the only physical evidence presented showed only an injury to the "outside" of the victim's anus. The medical expert, nurse Sue Ross, testified that while some of the injury "may have been outside the fold," some of the injury was "clearly . . . within the anal, rugal folds." We conclude that a reasonable jury could have interpreted this testimony to establish that the victim's injury was at least partially "within" the anus, as well as immediately outside the anus, and therefore the jury could properly find that sexual penetration had occurred.

Second, we disagree with the Defendant's implication that, in this case, "sexual penetration" would require proof of full digital intrusion of the victim's anal opening and that evidence of anything less would support merely attempted child rape or attempted rape. Our supreme court has recognized that "[t]here is . . . 'sexual penetration' in a legal sense if there is the slightest penetration of the sexual organ of the female . . . . It is not necessary that the vagina be entered or that the hyman be ruptured; the entering of the vulva or labia is sufficient." <u>Hart v. State</u>, 21 S.W.3d 901, 905 (Tenn. 2000); <u>see also</u> <u>State v. Bowles</u>, 52 S.W.3d 69, 74 (Tenn. 2001) (quoting <u>Hart</u>, 21 S.W.3d at 905, and citing to <u>Wharton's Criminal Law</u> § 278 (15th ed. 1995) (noting that entry of the anterior of the female genital organ is sufficient penetration for rape)). Based on analogous case precedent finding entry of the female labia meets the definition of "sexual penetration," along with the statutory language of "any . . . intrusion, however slight," we conclude that a reasonable jury could have found the physical evidence showed penetration beyond a reasonable doubt even without evidence of full digital intrusion of the victim's anal opening. We note that our supreme court has held that "[t]he occurrence of penetration, even though penetration is statutorily defined, is a question of fact." <u>Bowles</u>, 52 S.W.3d at 74. Moreover, this Court has previously upheld a conviction for rape where the minor victim "testified that the defendant's penis had touched the inside of his 'butt.'" <u>State v. Ray Charles Gasaway</u>, No. 01C01-9703-CR-00101, 1998 WL 131536, at * 2 (Tenn. Crim. App., Nashville, Mar. 24, 1998). This Court concluded: "Because the defendant's penis could have touched the inside of [the victim's] body by intrusion, [the element of sexual penetration] was sufficiently established." <u>Id.</u>

Third, the circumstantial evidence in this case pointing to the Defendant's rape of the victim is significant. The victim's mother heard her child exclaim "ouch"; she immediately went to check on her child only to find her in the same bed as the Defendant; the Defendant was dressed in nothing but his boxers; the victim's pants looked as though they had been pulled up quickly; and upon

examining the child, Ms. Sims found blood coming from the victim's buttocks. This circumstantial evidence, when combined with the physical evidence presented by the medical expert and the victim's incriminating statements, supports the jury's determination that the Defendant sexually penetrated the victim. See State v. Gibson, 973 S.W.2d 231, 236-37 (Tenn. Crim. App. 1997) (holding the evidence was sufficient to support a conviction for rape of a child by digital penetration--even though medical tests were normal--where there was expert testimony that penetration could have occurred consistent with the test results; the victim and defendant indicated digital penetration may have occurred; testimony placed the defendant and victim at the same location at the time of the act; and the statute defines sexual penetration to include intrusion "however slight").

Finally, the Defendant argues that the "only" testimony of sexual penetration was the victim's hearsay statements, which the Defendant argues were erroneously admitted. As noted above, we have held that the victim's hearsay statements "my bootie hurts" and "Chuck stuck his [finger] in my bootie" were properly admitted into evidence at trial pursuant to the long recognized "excited utterance" hearsay exception. Properly admitted, this witness testimony becomes an issue for the jury. While the victim's statements, as related by the victim's mother, conflict with the testimony presented by the Defendant at trial, questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and as stated above, this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236.

After considering all the evidence in the light most favorable to the State, we determine that the Defendant has failed to demonstrate that the jury was presented with insufficient evidence at trial for any reasonable trier of fact to determine that he sexually penetrated the victim. Accordingly, we conclude that the record contains sufficient evidence to support the jury's conclusion that the Defendant is guilty of child rape and rape beyond a reasonable doubt. This issue is without merit.

## III. Admission of Expert Witness Testimony

The Defendant also claims the trial court erred by allowing the State's DNA expert witness to "speculate" about the significance of the amount of the victim's DNA found under the Defendant's fingernails and by allowing the prosecutor to argue this was relevant during closing arguments. To support this argument, the Defendant notes that the DNA expert had stated in a jury-out hearing that neither the amount of DNA recovered nor the ratio between the amount of the victim's DNA versus the amount of the Defendant's own DNA recovered had any known scientific significance. Nonetheless, the expert testified before the jury that the evidence suggested "more than casual contact" between the victim and the Defendant. The prosecution, in its closing argument, stated that the amount of the victim's DNA recovered was relevant because it showed the Defendant's claim of limited contact with the victim was "absurd." The Defendant argues that it was error to admit the DNA expert's speculative testimony concerning the significance of the amount of the victim's DNA found under the Defendant's fingernails because such testimony is not proper expert testimony, and furthermore, was irrelevant. Thus, the Defendant claims the admission of this testimony violated Tennessee Rules of Evidence 702 and 402.

The State argues that the DNA expert provided testimony that was "not unduly speculative" and therefore properly admissible. To support this argument, the State notes that the expert witness was merely stating the fact that the victim's DNA was found under the Defendant's fingernails and there was more of the victim's DNA found than the Defendant's own DNA, from which the "jury could properly conclude" that the Defendant had contact with the victim. The State, in its appellate brief, also states that the "Defendant had denied having any contact with [the victim] and the evidence was contrary to Defendant's position."[8] Thus, the State argues "the only fact proven" by the expert witness testimony was "that the Defendant had contact with the victim" and this testimony was necessary to refute the Defendant's claim he did not have contact with the victim. Finally, the State asserts that "[t]he jury was free to apply common sense as they considered the evidence and the assistant district attorney was entitled to make arguments based on reasonable inferences that might be drawn from the evidence presented. Both the expert testimony presented and the Sate's argument were proper."

In this case, Agent Johnson, the State's DNA expert witness, was questioned during a jury-out hearing regarding the expert testimony he would provide. When asked if he was aware of any studies that indicate whether the quantity of a person's DNA found in a testing sample was significant, he answered in the negative. When asked what the significance was of more of the victim's DNA discovered under the Defendant's fingernails than the Defendant's own DNA and what it suggested about how the DNA got there, Agent Johnson responded: "I don't know. I mean -- I don't know. I mean I don't know how to answer that. I don't know anything to compare that to." The trial court concluded that Agent Johnson could testify about the amount of DNA he found, what its relevance was, and what his knowledge about this subject was.

At trial, Agent Johnson concluded that because more of the victim's DNA was found in the testing samples from the Defendant's fingernails than the unknown source and even his own DNA, "it wouldn't be just casual contact. I mean, it would be more than that." However, when the defense counsel asked Agent Johnson if it was true that he was unaware of "a single study on earth, done by a single scientist anywhere, that gives any significance to major or minor other than just the ratio is higher" and that he personally did "not know what the ratio means," Agent Johnson replied: "Exactly." Nonetheless, during closing arguments, the prosecution noted that there was more of the victim's DNA found under the fingernails of the Defendant's left hand than his own DNA and that this was "important" because, under the State's theory, the Defendant used his left hand to digitally penetrate the victim's anus.[9] The prosecution also stated: "How can this man have sex for three

---

[8] We disagree with the State's assessment of the Defendant's position on this issue. From our review of the record, the Defendant never "denied" he had "contact" with the victim. Rather, he admitted he rolled onto the victim during sex with Ms. Sims, and he also later "shook" the victim to wake her when he believed she was having a nightmare. The Defendant denied having sexual contact with the victim.

[9] The record reveals that more of the victim's DNA was recovered than the Defendant's DNA from samples of the left hand scrapings and right hand clippings, while the right hand scrapings found both the victim and the Defendant to be the major contributors, and the left hand clippings produced DNA from only the Defendant. We are unsure how
(continued...)

hours with [the victim's] mother and the only unknown that we have is a small amount in comparison to his and to [the victim's] and yet in the space of a few seconds he can get the majority of [the victim's] DNA under his fingernails. That, ladies and gentlemen, is absurd."

Under Tennessee law, relevant evidence is generally admissible unless its probative value is substantially outweighed by its prejudicial effect. See Tenn. R. Evid. 402 and 403. Evidence is "relevant" if it tends to "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. In addition to the general relevance rules, expert opinion testimony based on "scientific, technical, or other specialized knowledge" must also "substantially assist the trier of fact to understand the evidence or to determine a fact in issue." Tenn. R. Evid. 702.

As a general rule, expert testimony concerning DNA analysis is admissible. See State v. Begley, 956 S.W.2d 471, 478 (Tenn. 1997). However, all expert testimony must meet the three McDaniel v. CSX Transp., Inc., 955 S.W.2d 257 (1997), criteria: (1) the evidence is relevant to a fact at issue in the case; (2) the expert must be qualified by specialized knowledge, skill, experience, training, or education in the field of expertise, and the testimony in question must substantially assist the trier of fact to understand the evidence or determine a fact in issue; and (3) when the expert witness offers an opinion or states an inference, the underlying facts or data upon which the expert relied must be trustworthy. Id. at 264. Our supreme court has further held that the reliability of scientific evidence is determined by considering the following nonexclusive list of factors:

1. Whether the scientific evidence has been tested and the methodology with which it has been tested;
2. Whether the evidence has been subjected to peer review or publication;
3. Whether a potential rate of error is known;
4. Whether. . . the evidence is generally accepted in the scientific community; and
5. Whether the expert's research in the field has been conducted independent of litigation.

Begley, 956 S.W.2d at 475 (citing McDaniel, 955 S.W. 2d at 262).

In this case, Agent Johnson was certified by the court as an expert in the field of forensic science and DNA analysis. The Defendant argues that the "fact that more of [the victim's] DNA was found than any other person's . . . is irrelevant, because the prosecution's own expert testified that such a fact has no evidentiary significance." Additionally, the Defendant argues that the prosecution's repeated reference to the expert's speculation on the relevance of this fact magnified the error and requires a reversal of his conviction. We agree that the trial court erred in admitting the speculative testimony and in allowing the prosecution to bolster its case on this erroneously admitted testimony.

---

[9](...continued)
the prosecution arrived at it's theory that the Defendant used his left hand based on the DNA evidence.

Agent Johnson's testimony that the amount of the victim's DNA found in the samples taken from the Defendant's fingernails was significant because it represented more than "casual contact" was indeed speculative in that it was not based on "scientific, technical, or other specialized knowledge." Tenn R. Evid. 702. Agent Johnson admitted that his conclusion that the evidence suggested more than casual contact was not based on any scientific study or even his opinion as an expert in the field of DNA analysis. Rather, he stated that he really did not know what the ratio meant or even if it had any significance at all. As such, this testimony did not "substantially assist the trier of fact to understand the evidence or to determine a fact in issue" as is required of expert testimony. Tenn. R. Evid. 702. Rather, this testimony served only to further confuse the jury on the already difficult to understand subject of DNA forensic evidence.

Additionally, contrary to the State's argument on appeal, this statement by the DNA expert is not relevant to refute the Defendant's testimony that he never had contact with the victim; the Defendant did not deny having any contact with the victim. Furthermore, we disagree with the State's assertion that "[t]he jury was free to apply common sense as they considered the evidence [presented by the DNA expert] and the assistant district attorney was entitled to make arguments based on reasonable inferences that might be drawn from the evidence presented." To the contrary, the evidentiary exception of allowing expert opinion testimony is limited to only those situations where "specialized knowledge" is needed, and even then expert opinion testimony is admissible only if it will "substantially assist" the jury in understanding the evidence. Accordingly, we find the admission of the DNA expert's speculative testimony was error. This error was, unfortunately, also compounded by the trial court's allowing the prosecution to make this issue a key component of its closing argument.

Finding the admission of the DNA expert witness' speculative testimony was error, the question remains as to whether this error was harmless or so affirmatively affected the jury's verdict so as to merit a new trial. This error, a violation of the rules of evidence, is a nonconstitutional error, and therefore is not presumed to be reversible. State v. Ely, 48 S.W.3d 710, 725 (Tenn. 2001). The defendant bears the burden of showing that the error affirmatively appears to have affected the result of the trial on the merits or the error involves a substantial right which more probably than not affected the judgment or resulted in prejudice to the judicial process. Id.; see also Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a). Upon considering all the evidence in the record, we are inclined to conclude that the admission of the improper DNA expert testimony, standing alone, would be harmless error. Had this been the only error in the Defendant's trial, it likely would not have affected the judgment or have resulted in prejudice to the judicial process. However, the cumulative effect of this error and the others noted in this opinion is addressed below.


**IV  Prosecutorial Misconduct**

The Defendant also claims that the prosecutor's reference during his closing argument to his own personal experience with sex offenders typically denying their crimes was improper and prejudicial. Accordingly, the Defendant now asserts that this statement amounts to prosecutorial misconduct and the trial court erred in failing to declare a mistrial or sustain his counsel's objection

at trial. To support this assertion, the Defendant argues that, especially in light of the court's earlier admonishment not to elicit expert testimony that sex offenders typically do not confess their crimes, the prosecutor's statement was both irrelevant and inadmissible as unsworn expert testimony. Moreover, the Defendant argues that the context, lack of curative measures, intent and cumulative effect of the improper argument affected the verdict to his prejudice. The State argues that the prosecutor was merely attempting to point out the inconsistences in the Defendant's testimony, which suggested untruthfulness. The State further argues that even if the closing argument was improper, it was not so inflammatory as to affect the verdict, and therefore the Defendant was not prejudiced.

Our supreme court has long recognized that counsel for both the State and the defense are permitted wide latitude in arguing their cases to the jury. See State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998). Likewise, trial judges are accorded wide discretion in their control of these arguments, State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995), and this discretion will not be interfered with on appeal absent abuse of this discretion. See Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975). Nonetheless, such arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law. See Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995). As stated by the United States Supreme Court, a prosecutor may present arguments forcefully, "[b]ut, while he may strike hard blows, he is not at liberty to strike foul ones." Berger v. United States, 295 U.S. 78, 88 (1935). Thus, the State is not permitted to engage in argument designed to inflame the jurors and must restrict its comments to matters properly admitted into evidence at trial. See State v. Hall, 976 S.W.2d 121, 158 (Tenn. 1998).

However, simply finding an argument improper does not alone merit a new trial. When argument is found to be improper, the established test for determining whether there is reversible error is "whether the conduct was so improper or the argument so inflammatory that it affected the verdict to the Appellant's detriment." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003) (citing Harrington v. State, 385 S.W.2d 758, 759 (1965)). This Court has adopted a five-part test to measure the prejudicial impact of improper prosecutorial misconduct, which requires appellate court's to examine the following factors: (1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecutor; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. See Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); see also Goltz, 111 S.W.3d at 5-6.

In this case, the following conversation took place during the prosecution's re-direct of Detective Gipson:

> COUNSEL FOR STATE: Detective Gipson, you have interviewed a lot of people accused of this particular crime. Correct?
>
> DETECTIVE GIPSON: A lot.

COUNSEL FOR DEFENDANT:  I object.  I know where this is going.

COUNSEL FOR THE STATE:  Is it typical, in your experience, for people accused of this crime to voluntarily confess to what is going on?

COUNSEL FOR THE DEFENDANT:  I object.

THE COURT:  Wait a minute.  Come up here.

Whereupon a bench conference was held outside the presence of the jury, in which the Defendant's counsel argued that what other suspects in other sex crime cases do was irrelevant to the Defendant's trial.  The State argued that the question laid a foundation for how law enforcement interviews sex crime suspects.  At the conclusion of the bench hearing, the trial court instructed the prosecutor as follows: "I think you're going to need to limit how you ask [Det. Gipson] questions with respect to how other people do things.  You can ask him what he does.  But how other people do things, that's a problem."

Later, during closing arguments, the following argument was presented to the jury:

COUNSEL FOR THE STATE:  For nineteen years my job has been to represent the most vulnerable victims that we have in our system, little children; whether it's handling child sex abuse cases, physical abuse case[s], child homicide cases, that's what I do.  I would like to think I am fairly good at it, having been doing it for as long as I have, but sometimes I fail in my efforts.  I am not always successful.  But one thing that nineteen years of doing this has taught me is that there is always a defense.  And another thing that nineteen years has always taught me is that denial is endemic to this process, denial by offenders of doing this crime.
    We have got drug dealers and murderers, and all kinds of other criminals that walk into court every single day and have no problem admitting guilt about those kinds of crimes.  Those are serious crimes.  But sex offenders are a different breed entirely –

COUNSEL FOR THE DEFENDANT:  Your Honor, this is testimony from an expert about what sex offenders do.

THE COURT:  It's closing argument.  I'll --
COUNSEL FOR THE STATE:  No.  This is in response to your counsel's argument about the truth.

THE COURT:  Go ahead.

In sum, the portion of the State's closing argument at issue was essentially the prosecutor's personal "expert" opinion that his nineteen years experience prosecuting criminals taught him that murderers,

drug dealers and others accused of serious crimes will freely admit their criminal activities in a court of law, but sex offenders deny their crime. The Defendant argues that this statement was improper. We agree.

The prosecutor's statements during closing argument were far from "temperate"; rather, they seemed to be crafted specifically to inflame the jury into concluding that those accused of sex crimes are more likely than those accused of other crimes to lie and say they are innocent when they are in truth guilty. Furthermore, the prosecutor's "expert" opinion on the propensity of sex crime defendants to deny their crimes was not based upon evidence properly introduced at trial. Accordingly, we conclude that the prosecutor's statements were improper, and therefore the key issue now before this Court is whether this conduct prejudiced the Defendant.

Following the five factors outlined in Judge, we begin our analysis by examining the prosecutor's conduct in light of the facts and circumstances of the case. We note that the prosecutor's remarks were made in response to defense counsel's assertions that the Defendant had the courage to take the stand and profess his innocence. However, the prosecutor nonetheless stepped over the line in his attempt to point out the inconsistencies in the Defendant's testimony. First, this Court has previously held that it is improper for a prosecutor to assert his or her own personal opinion as to the credibility of a witness. See State v. Thornton, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999). Second, the subject matter of the expert opinion the prosecutor attested was inadmissible evidence. Tennessee courts have consistently rejected the admission of expert testimony pertaining to behavior characteristics of offenders in order to demonstrate a "propensity" to commit a certain crime. See State v. Campbell, 904 S.W.2d 608, 616 (Tenn. Crim. App. 1995) (holding the trial court did not error in finding the rules of evidence exclude the testimony of a psychologist who would have testified that the defendant did not have the "propensity" or "predisposition" to sexually abuse children). In like manner, "expert" opinion that defendants charged with a certain type of crime have the "propensity" to deny they committed the crime or have a "predisposition" to lying would also be inadmissible. Finally, the prosecutor's remarks are all the more unfortunate upon consideration of the fact that the trial court had previously instructed him not to elicit expert testimony from Detective Gipson that sex offenders "typically" do not admit their crimes.

As to the second factor, the Defendant argues, and the State concedes, that no curative steps were taken. The better practice would have been for the trial court to give "a curative instruction immediately upon the heels of the objection." State v. Sabrina Renee Lewis, No. M2004-02255-CCA-R3-CD, 2006 WL 684590, at * 14 (Tenn. Crim. App., Nashville, Mar. 15, 2006).

Regarding intent, the circumstances surrounding the prosecutor's statement tend to support the Defendant's assertion that the argument was "a deliberate attempt to inject improper, prejudicial and inadmissible evidence into the record." While it is admittedly difficult to discern prosecutorial intent, in this case, we note the prosecutor had recently been admonished not to introduce the same opinion when examining Detective Gipson. Moreover, the statements were the prosecutor's opening remarks during his closing argument and were therefore not likely inadvertent. The record before

-23-

us strongly suggests the prosecutor's intent was to get his theory that sex offenders typically deny their crimes before the jury by any means possible.

As to the cumulative effect of the improper conduct and the other errors in the record, we have found the admission of the DNA expert testimony was error, and as discussed below, we conclude that the court also erred in instructing the jury and in failing to merge the offenses. Thus, the cumulative effect weighs in favor of the Defendant.

Moreover, the fifth and final factor, the relative strength or weakness of the case, does not mandate we find the prosecutorial misconduct harmless. While the evidence was legally sufficient, it is hardly overwhelming, and the series of errors outlined in this opinion appear to have affected the jury's verdict in this case.

As with the error in admitting the improper DNA expert testimony, the prosecutorial misconduct alone would likely be harmless error. We cannot say, based on all the evidence contained in the record, that the prosecutorial misconduct, examined in isolation of all other errors, rose to the level of affecting the result of the trial on the merits. However, we examine the cumulative effect of this error and others below.

## V. Jury Instruction on Recklessness

The Defendant also claims the trial court erred in instructing the jury that all the elements for the offense of child rape could be met through a culpable mental state of recklessness. To support his claim, the Defendant argues that the sexual penetration element within the child rape offense is a "nature of conduct" element that can only be satisfied with proof of an intentional or knowing culpable mental state. Accordingly, the Defendant argues the trial court erred in instructing the jury that all the elements of the offense of child rape could be met by a showing that the Defendant acted intentionally, knowingly or recklessly. This jury charge, the Defendant argues, impermissibly lowered the State's burden of proof by allowing the jury to convict the Defendant upon a finding of a merely "reckless" sexual penetration. The Defendant further argues that this error was not harmless because testimony was presented at trial that the Defendant may have accidentally penetrated the victim while engaged in sexual intercourse with the victim's mother; a scenario the jury may have concluded was "reckless" penetration. The Defendant concedes he did not object to the erroneous jury instruction at trial but argues this Court should address this claim on appeal as plain error.

The State concedes that the trial court erred in instructing the jury that all the elements of the offense of child rape are satisfied by a culpable mental state of recklessness but maintains that the error was harmless. To support its position, the State argues that the prosecution's theory throughout the entire trial was intentional penetration. The State notes that the Defendant testified it would not be possible to "accidentally" penetrate the victim's anus, as she was wearing panties and pants at the time. Because the prosecution never pursued any theory other than intentional penetration, and because the Defendant never argued a defense of accidental or reckless penetration, the State now

-24-

argues that the jury was never misled by the erroneous jury instruction, and therefore, the error was harmless.

We begin our analysis by first noting that the issue is not waived. While the Defendant did fail to contemporaneously object to the jury instruction at trial, he did raise this issue in an amended motion for new trial. As noted by the State, our supreme court has held that an erroneous or inaccurate jury charge, as opposed to an incomplete jury charge, may be raised for the first time in a motion for a new trial and is not waived by the failure to make a contemporaneous objection. State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005) (citing State v. Lynn, 924 S.W.2d 892, 898-99 (Tenn. 1996); Tenn. R. Crim. P. 30(b)). Accordingly, we find this issue has been properly preserved for appeal, and we need not apply a plain error analysis to address the merits of the Defendant's claim.

The law in Tennessee is well-settled: "a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury upon proper instructions." State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001). (citations omitted). The law further requires that all of the elements of each offense be described and defined in connection with that offense. State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989); State v. Ducker, 27 S.W.3d 889, 899 (Tenn. 2000). A criminal defendant denied a correct and complete charge of the law is deprived of the constitutional right to a jury trial, which subjects the erroneous jury instruction to a harmless error analysis. An appellate court may consider an instruction prejudicially erroneous "only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." Faulkner, 154 S.W.3d at 58 (citing State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998)).

In this case, the trial court instructed the jury as follows:

I shall now proceed to explain to you what in law it takes to constitute the offenses as charged in the indictment in this case.

Rape of a child: Any person who commits the offense of rape of a child is guilty of a crime. For you to find the defendant guilty of this offense the State must have proven beyond a reasonable doubt the existence of the following essential elements: One, that the defendant had unlawful sexual penetration of the alleged victim, or the alleged victim had unlawful penetration of the defendant; and, two, that the alleged victim was less than thirteen years of age; and, three, that the defendant acted either intentionally, knowingly, or recklessly.

The trial court then explained the three mental culpable states, defining "recklessly" as follows:

Recklessly means that a person acts recklessly with respect to circumstances surrounding the conduct or the result of conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary

-25-

person would exercise under all of the circumstances as viewed from the accused person's standpoint.

At the outset of the analysis of the issue pertaining to the jury instructions on the mens rea required for the offense of rape of a child, we note that this portion of the opinion represents the views of Judge Welles only. In a separate opinion, Judges Tipton and Williams conclude that the trial court did not err in instructing the jury regarding all three mental states applying to rape of a child.

I note that the offense of child rape does not expressly specify the applicable culpable mental state in its statutory definition. See Tenn. Code Ann. § 39-13-522. By statute, when a criminal offense "does not plainly dispense with a mental element, intent, knowledge or recklessness suffices to establish the culpable mental state." Id. § 39-11-301(c). These three default culpable mental states are themselves defined in relation to three possible types of conduct: 1) nature of conduct, 2) circumstances surrounding the conduct, and 3) result of conduct. The three culpable mental states incorporate into their definition one or more of the three types of conduct as follows:

> (a) "Intentional" refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result.
>
> (b) "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.
>
> (c) "Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Id. § 39-11-302(a)-(c) (emphasis added). In sum, a culpable mental state of "intentional" relates to nature of conduct or result of conduct elements; "knowing" relates to all three: nature of conduct, circumstances surrounding conduct, or the result of conduct; and most significant in this particular case, "recklessly" relates only to circumstances surrounding conduct or result of conduct elements. Id.; see also State v. Weltha Womack, No. E2003-02332-CCA-R3-CD, 2005 WL 17428, at *9 (Tenn. Crim. App., Knoxville, Jan. 4, 2005). This Court has held that "[g]enerally, only the culpable mental states of 'intentional' and 'knowing' are applicable to nature-of-conduct crimes." State v.

Deji A. Ogundiya, No. M2002-03099-CCA-R3-CD, 2004 WL 315138, at *5 (Tenn. Crim. App., Nashville, Feb. 19, 2004).

In State v. Chester Wayne Walters, No. M2003-03019-CCA-R3-CD, 2004 WL 2726034, at *14 (Tenn. Crim. App., Nashville, Nov. 30, 2004), a panel of this Court recognized that the offense of rape of a child contains all three conduct elements: nature of conduct, result of conduct, and circumstances surrounding conduct. The panel further held that "unlawful sexual penetration of the victim is both nature of the conduct and result of the conduct [element]." Id. at 13; see also State v. Frederick Leon Tucker, No. M2005-00839-CCA-R3-CD, 2006 WL 547991, at *13 (Tenn. Crim. App., Nashville, Mar. 7, 2006) (noting that nature of the conduct involves the physical act and that the result of the conduct is the harmful result). The panel also held that the victim's age element in the offense of child rape is a circumstance surrounding the conduct. See Walters, 2004 WL 2726034, at *13 (citing Ogundiya, 2004 WL 315138, at *6). Thus, in the offense of child rape, the victim's age, a circumstances of conduct element, may be satisfied by the culpable mental states of "knowing" or "reckless," but, in my view, unlawful sexual penetration, a nature of conduct and result of conduct element, may be satisfied only by the culpable mental states of "intentional" or "knowing,"-- and not by a mens rea of "reckless."

When an offense contains different culpable mental states, as does the crime of child rape, special care must be taken to provide a correct and complete instruction of the law. This Court has previously held that "[w]hen an offense has different mens rea for separate elements, the trial court must set forth the mental state for each element clearly so that the jury can determine whether the state has met its burden of proof." State v. Howard, 926 S.W.2d 579, 587 (Tenn. Crim. App. 1996) overruled on other grounds by State v. Williams, 977 S.W.2d 101 (Tenn. 1998); see also Ogundiya, 2004 WL 315138, at * 6 (acknowledging the failure of the trial court to "explain that the mens rea of recklessness was applicable only to the victim's consent," a circumstances surrounding conduct element, and instructing the court upon remand to "carefully instruct the jury as to the applicable mens rea for each element of the offense.").

In this case, the trial court instructed the jury that the offense of child rape had three elements: 1) unlawful sexual penetration, 2) the victim was less than thirteen years of age, and 3) "that the defendant acted either intentionally, knowingly or recklessly." (emphasis added). The trial court's inclusion of all three culpable mental states as a third element, along with the disjunctive language "either" and "or," conveyed to the jury that any one of the three culpable mental states would satisfy any of the prior two elements of the offense. Thus, in my view, the trial court clearly did not differentiate and carefully instruct the jury as to the applicable culpable mental state for each element of the offense of child rape.

In Womack, a panel of this Court determined that the trial court erred in instructing the jury on aggravated rape because the mental state of recklessness was included in the instruction along with the culpable mental states of intentional and knowing. The panel held that sexual penetration, as used in the offense of aggravated rape, was a nature of conduct element. Therefore, the panel determined that inclusion of the mental state of recklessness in the jury instruction lessened the

State's burden of proof by permitting a conviction based on reckless penetration. As a result, the panel concluded that the instruction was error, and furthermore, held the error was not harmless beyond a reasonable doubt. See Womack, 2005 WL 17428, at *9. I find the reasoning in Womack and Ogundiya persuasive and believe the holdings in these two cases are determinative of the issue now before us on appeal.

I note that there is an apparent split of authority within our Court on this issue, as several panels of this Court have held that the general inclusion of the mens rea of recklessness in jury instructions on the offenses of rape and child rape that include the element of unlawful sexual penetration do not amount to error. A panel of this Court held in Walters that, because child rape contained elements that encompassed all three types of conduct and instruction listing all three culpable mental states was given, such instruction was not error. Walters, 2004 WL 276034 at * 14. The Walters Court found Ogundiya's requirement to distinguish the different mens rea requirement for each element as inapplicable because such instruction was dicta.[10] Id. I also note that Walters was released before Womack.

I further note that another panel of this Court also found no error in including the recklessness instruction for the offense of child rape. In State v. Tucker, this Court reasoned that our supreme court's recent ruling in State v. Faulkner "restricted the holding" in State v. Page, 81 S.W.3d 781 (Tenn. Crim. App. 2002), where this Court held that incorrect jury instruction on the culpable mental state/type of conduct relationship was reversible error. See Tucker, 2006 WL 547991, at *13. The Tucker Court interpreted Faulkner to hold that adding an incorrect mens rea to a jury charge did not amount to error as long as the correct definition was also included. Id. (citing Faulkner, 154 S.W.3d at 58-60). However, a careful examination of Faulkner reveals that the supreme court's "restriction" of Page was limited to holding that an additional, non-essential instruction, which does not lesson the burden of proof, does not amount to reversible error. The Faulkner Court, commenting on Page, stated: "The superfluous language in the 'knowing' definition did not lesson the burden of proof because it did not relieve the State of proving beyond a reasonable doubt that the defendant acted knowingly."[11] Faulkner, 154 S.W.3d at 59. Thus, our supreme court concluded that "the inclusion of such surplusage falls short of being a 'misstatement of an element.'" Id. at 60.

In this case, it is my opinion that the trial court's instruction on the reckless culpable mental state applying to the element of sexual penetration did lesson the State's burden of proof. Also, contrary to the holding in Tucker, the trial court in this case specifically assigned all three culpable

---

[10]Walters did not address State v. Howard, 926 S.W.2d at 587, which also holds that the trial court should "set forth the mental state for each element clearly so that the jury can determine whether the state has met its burden of proof."

[11] In Page, the trial court gave an erroneous instruction which defined the entire scope of the "knowing" culpable mental state when only the result of conduct definition applied. Page, 81 S.W.3d at 789.

mental states to each element in the offense of child rape.[12] The Tucker Court also cited to two supreme court cases that seem to indicate that the sexual penetration element of child rape can be satisfied by a mens rea of intentional, knowing or reckless. See State v. Barney, 986 S.W.2d 545, 550 (Tenn. 1999); State v. Hill, 954 S.W.2d 725, 729 (Tenn. 1997). However, in both of these cases, the supreme court was addressing controversies pertaining to the sufficiency of an indictment and referenced the mens rea requirements for the sexual penetration element of the offense of child rape only in dicta. It is well established that obiter dictum is not binding under the doctrine of stare decisis. See Metro. Gov't of Nashville & Davidson County v. Reynolds, 512 S.W.2d 6, 10 (Tenn. 1974). Thus, while I agree with the Tucker Court's conclusion that the "overwhelming evidence" of penetration in that case rendered any error resulting from instruction on "reckless" harmless, I decline to adopt its holding that the instruction itself did not constitute error. Tucker, 2006 WL 547991, at * 13.

Accordingly, I conclude that it was constitutional error for the trial court to instruct the jury that the culpable mental state of recklessness would satisfy the unlawful sexual penetration element in the offense of child rape. Because sexual penetration is a "nature of conduct" and "result of conduct" element, instruction that a mental culpable state of "reckless" would satisfy this element impermissibly lowered the State's burden of proof. As such, I conclude that the Defendant did not receive a correct and complete charge of the law – an error that violated his constitutional right to a jury trial. Having concluded the jury instruction was error, I now seek to determine whether the error was harmless or merits reversal.

As noted above, a criminal defendant denied a correct and complete charge of the law is deprived of the constitutional right to a jury trial, which subjects the erroneous jury instruction to a constitutional harmless error analysis. Because the right is constitutional in nature, the State bears the burden of showing the depravation of this right is harmless beyond a reasonable doubt. Momon v. State, 18 S.W.3d 152, 167 (Tenn. 1999). Moreover, an error affecting a constitutional right is presumed reversible, and such error will result in reversal of the conviction unless the State shows beyond a reasonable doubt that the error did not prejudice the outcome of the trial. Ely, 48 S.W.3d at 725.

This Court will consider an instruction prejudicially erroneous "only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." Faulkner, 154 S.W.3d at 58. Nonetheless, because the evidence presented was legally sufficient to support the conviction for rape of a child, the prosecution argued only intentional penetration, and a defense of reckless penetration was never raised, it is unlikely that the jury instruction error, standing alone, misled the jury and prejudicially affected the judgment or the judicial process. Accordingly, I conclude that the jury instruction error, in isolation of the other errors, would be harmless error. The cumulative effect of this error and the others outlined in this opinion is

_____

[12]In Tucker, this Court stated that "[n]o specific mental state was assigned to the definition of rape of a child; rather, the mental states of intentionally, knowingly, and recklessly were defined separately." Tucker, 2006 WL 547991, at *13.

addressed below. Again, I point out that Judges Tipton and Williams do not join in this analysis of this issue. Their view is set forth in the separate opinion filed by Judge Tipton.

## VI. Merger of the Convictions.

In his final issue on appeal, the Defendant argues that the trial court erred in entering separate judgments against the Defendant for rape on counts two and three of his indictment after announcing that the two rape convictions would merge into the Defendant's conviction for child rape. To support this assertion, the Defendant argues that the three separate charges in the Defendant's indictment were alternative theories relating to the one single act of rape. The Defendant also points out that the record clearly reveals the trial court stated that the convictions would be merged at the conclusion of the trial. However, at sentencing, the court imposed separate sentences, although running them concurrent, and issued three separate judgments of conviction, thereby imposing three felony convictions against the Defendant. The Defendant claims the trial court erred in failing to merge his rape convictions into the child rape conviction and asks this Court to vacate his two rape convictions. The State concedes that the trial court's failure to merge the lesser rape convictions into the child rape conviction was error.

"Multiplicity concerns the division of conduct into discrete offenses, creating several offenses out of a single offense." State v. Phillips, 924 S.W.2d 662, 665 (Tenn. 1996). Multiple convictions for the same offense violate both federal and state constitutional prohibitions against double jeopardy. See U.S. Const. amend. V; Tenn. Const. art. I, § 10. Our supreme court established a framework for determining whether a defendant has received multiple punishments for the same offense. See State v. Denton, 938 S.W.2d 373, 381 (Tenn.1996). The reviewing court must consider: (1) the statutory elements of the offenses, (2) the evidence used to prove the offenses, (3) whether there were multiple victims or discrete acts, and (4) the purposes underlying the statutes involved. See id.

In the present case, the facts are not disputed. The Defendant was charged with child rape in count one of his indictment and alternatively charged with two counts of rape, under differing theories, in counts two and three of his indictment. All three charges clearly relate to the same single event. Accordingly, the trial court should have merged the lesser rape convictions into count one – the rape of a child conviction. "Merger avoids a double jeopardy problem while protecting the jury's findings." State v. Timmy Reagan, No. M2002-01472-CCA-R3-CD, 2004 WL 1114588, at *20 (Tenn. Crim. App., Nashville, May 19, 2004). Accordingly, if the Defendant's child rape conviction is affirmed we would be required to vacate the Defendant's two judgments of conviction for rape and remand with instructions to modify the Defendant's child rape judgment to reflect the merged convictions. However, because we conclude that the cumulative effect of the series of errors in this case appears to have affected the results of the trial and jury verdict, we are vacating all of the Defendant's convictions and remanding this case to the trial court for a new trial. Accordingly, this merger issue is moot.

**VII. Harmless Error Analysis and Cumulative Effect**

In addition to the error in failing to merge the Defendant's convictions, we have also found the admission of the improper testimony from the State's DNA expert and the prosecutorial misconduct to be error. One panel member has concluded that the erroneous jury instructions amounted to constitutional error. While all of these errors individually may be harmless, we must consider the cumulative effect of all of the errors in this case. We note the purpose of a harmless error analysis is to discern the basis on which the jury actually rested its verdict. See Momon, 18 S.W.3d at 167. Additionally, the line between harmless and prejudicial error is in direct proportion to the degree of the margin by which the proof exceeds the standard required to convict beyond a reasonable doubt. See State v. Gilliland, 22 S.W.3d 266, 274 (Tenn. 2000).

In this case, the proof, while legally sufficient, does not greatly exceed the required margin to convict. The Defendant was convicted upon hearsay evidence, circumstantial evidence, and limited scientific evidence. Additionally, the record reflects errors in the admission of expert testimony, prosecutorial misconduct, and in the opinion of one panel member, faulty jury instructions. Therefore, we conclude that the cumulative effect of the errors in this case more probably than not affected the outcome of the trial, resulted in prejudice to the judicial process, and deprived the Defendant of a meaningful defense.

## CONCLUSION

Based on the forgoing reasoning and authorities, we reverse the Defendant's convictions and remand this matter for a new trial consistent with this opinion.

_____
DAVID H. WELLES, JUDGE